**GENERAL COMMITTEE OF ADJUST-MENT, United Transportation Union E, Burlington Northern, Inc., Great Northern Segment, Appellant,**

v.

**BURLINGTON NORTHERN, INC., Brotherhood of Locomotive Engineers, Appellees.**

No. 79–1458.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 6, 1979.

Decided March 19, 1980.

Patrick J. Foley, DeParcq, Anderson, Perl, Hunegs & Rudquist, Minneapolis, Minn., for appellant.

Barry McGrath, St. Paul, Minn., for appellee, Burlington Northern, Inc.

Harold A. Ross, Ross & Kraushaar, Cleveland, Ohio and Robert V. Atmore, Lindquist & Vennum, Minneapolis, Minn., filed brief for appellee Broth. of Locomotive Engineers.

Before HEANEY and HENLEY, Circuit Judges, and SCHATZ, District Judge.*

HEANEY, Circuit Judge.

This matter is before the Court for a second time. When it was first here,[1] we made it clear that employees of Burlington Northern, Inc. (BNI), who are members of the United Transportation Union-E (UTU–E) working as engineers in the United States, have a right to have their merger-related disputes[2] decided by a Public Law Board on which the UTU–E is represented. As we there stated:

The issue is an important one not only to the employees of the BNI who are members of the UTU–E but also to the Union itself. An aggrieved employee cannot help but feel that his interests in an arbitration proceeding will be better served if his union representative sits in on the closed door discussions that follow a presentation than if a representative of a union to which he does not belong or to which he has not entrusted the adjustment of his grievance has this privilege. Yet, the employee's position on the seniority roster may be such that it is important to him to maintain his membership in the UTU–E. Moreover, an employee may have strong personal feelings for wanting to maintain membership in the union of his choice and to have that union process his grievances, including those that may be merger-related.

The UTU–E is certain to be affected if it loses the right to sit as a member of arbitration panels adjusting merger-related grievances. Some firemen, who might otherwise choose the UTU–E, will join the BLE [Brotherhood of Locomotive Engineers] simply because they will want the most effective representation possible. The problem is compounded because the line between merger-related grievances and those arising out of collective bargaining agreements is one that cannot always be drawn with certainty.

*Gen. Committee of Adjust. v. Burlington Northern, Inc.*, 563 F.2d 1279, 1284 (8th Cir. 1977).

We noted, however, that there was a conflict in the record as to whether the employees in question worked exclusively in Canada. The BNI asserted that such was the case. The Union took the position that at least one of the employees involved performed some work in Seattle, Washington. *Id.* at 1285–1286.

* The Honorable Albert G. Schatz, United States District Court for the District of Nebraska, sitting by designation.

1. *Gen. Committee of Adjust. v. Burlington Northern, Inc.*, 563 F.2d 1279 (8th Cir. 1977).

2. The underlying labor dispute involves the question of whether wage guarantees to engineers employed by Burlington Northern, Inc. (BNI) are to be adjusted downwards as a result of a settlement under the Canadian Labour Code which reduced the work week for railway engineers from six to five days.

We also noted that the UTU–E presented evidence that a long-standing custom and practice existed between the UTU–E and the BNI and its predecessors under which the parties agreed that work performed in Canada would be subject to the dispute settlement provisions of the Railway Labor Act. The BNI took a contrary position. *Id.*

We then disposed of the issue raised with respect to work performed exclusively in Canada by holding that the right to have a Public Law Board created "does not extend to claims submitted by employees who perform the disputed work exclusively outside the territorial limits of the United States." *Id.* at 1286. We specifically left open the question of whether jurisdiction of a Public Law Board over such disputes can be conferred by custom and practice and whether such a custom and practice exists. Finally, we remanded the matter to the district court to determine the questions left open and to determine whether the disputed work was performed exclusively in Canada.

On remand, the UTU–E conceded for the first time that the engineers filing the claims are yard engineers working in BNI's Vancouver, British Columbia, yards and are employed exclusively in Canada. It presented evidence, however, that a long-standing custom and practice exists between the UTU–E and BNI to submit merger-related disputes involving employees who work exclusively in Canada to a Public Law Board created pursuant to the Railway Labor Act.

█ The trial court, relying on our opinion in *United Transp. U. Loc. L. No. 31 v. St. Paul Union Depot Co.*, 434 F.2d 220 (8th Cir. 1970), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971), held that to establish a long-standing custom and practice, the conduct of the parties must encompass a continuity, interest, purpose and understanding which elevates a course of action to an implied contractual status. We find no error in this holding.

█ The trial court also found that

the evidence does not support UTU's contention that there has been a long-standing custom and practice to submit such disputes to a Public Law Board under the Railway Labor Act. The awards UTU cites are distinguishable on their facts as (1) involving disputes in connection with employees whose runs were international in scope involving a major portion of the route and time on the job within the United States, (2) involving a dispute under a collective bargaining agreement, the resolution of which would be the same in both countries under principles having application to working conditions common to both countries, or (3) involving a dispute where it was specifically agreed to by the parties that the matter should be arbitrated by a Public Law Board.

*General Committee of Adjustment, etc. v. United States of America and Burlington Northern, Inc.*, Civ. 4–75–444, slip op. at 4 (D.Minn., May 17, 1979).

This finding, while open to question, is not clearly erroneous: (1) Fewer than ten disputes involving work performed in Canada have been submitted to Public Law Boards established pursuant to the Railway Labor Act by the UTU–E and the BNI or its predecessors over the last forty years. (2) Many of the disputes involved employees whose runs were international in scope involving a major portion of the route and time on the job within the United States. (3) The remaining disputes involved questions under a collective bargaining agreement, the resolution of which would be the same in the United States and Canada under principles having application to working conditions common to both countries.[3]

Here, since the dispute does not involve employees having runs that are international in scope and the question at issue is unique to Canadian employees working exclusively in Canada, the dispute is distin-

---

**3.** The third reason given by the district court for holding that no long-standing custom and practice had been proved was that the parties had specifically agreed to submit the prior matters to a Public Law Board. We give this reason no weight on our affirmance.

guishable from those which, in the past, have been submitted to Public Law Boards.[4]

■ There are two additional matters which deserve mention. First, during the course of this protracted litigation, the BNI submitted these disputes to a BNI–BLE (Brotherhood of Locomotive Engineers) merger disputes committee. On November 15, 1977, the committee issued award No. LA–E, which favored the BNI. The UTU–E asked the district court and this Court to set aside that award. The district court declined to do so, stating that the question of whether the committee acted lawfully in rendering the award should be submitted to the appropriate Canadian authority. We also decline to set it aside believing, as does the district court, that the issue is one for the Canadian courts to determine.[5] We have held that the UTU–E has a right to have merger-related disputes involving work performed in the United States submitted to a Public Law Board on which the UTU–E is represented. It is for the Canadian tribunals to determine whether, under Canadian law, the UTU–E has the right to sit on a panel convened to decide merger-related disputes involving its members. Our refusal to set aside the BNI–BLE award should be given no weight by Canadian authorities. We simply defer to their judgment.

■ .Second, for the first time in its brief on appeal, the UTU–E raised the doctrine of "International Insignificance." That doctrine would apparently hold that a United States Public Law Board should have jurisdiction over this dispute because the merger was essentially consummated and approved in the United States and because BNI's Canadian operations are insignificant

compared to those in the United States. Whatever merit the doctrine may have in other contexts, it is not controlling here. We decided, on the first time around, that a Public Law Board would not have jurisdiction if the work in question was performed exclusively in Canada by Canadian employees unless the parties had conferred such jurisdiction by long-standing custom and practice. That decision was not appealed and is, therefore, the law of the case.

Costs will be taxed to the appellant.

---

4. In the light of our holding, it is unnecessary for us to decide whether the parties can voluntarily confer jurisdiction on Public Law Boards. We simply note that while the parties have done so on a number of occasions in the past, they have not done so here.

5. At oral argument, counsel for the BNI stated: I submit that the subject matter jurisdiction lies with the Canadian tribunal * * *. The opportunity is there for them and they may well be upheld by the appropriate Cana-

dian tribunal. My point is that we have got to get settled once and for all where they are going to go to and where we are going to look to and what body of law we are going to look at in deciding issues arising in Canada. * * * I think we should have a clear determination from this Court where the parties should go to when you have a Canadian facet of this kind involved in the issues and I submit * * * that it should be in Canada.