**BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Plaintiff,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, Defendant.**

**No. CV–84–213–GF.**

United States District Court,
D. Montana,
Great Falls Division.

July 31, 1985.

164

Joseph Prekop, Harold A. Ross, Cleveland, Ohio, Benjamin W. Hilley, Hilley & Loring, Great Falls, Mont. for plaintiff.

Thomas W. Spence, Billings, Mont., Alexander Blewett III, Jardine, Stephenson, Blewett & Weaver, Great Falls, Mont., Edward W. Mullen, Deacy & Deacy, Kansas City, Mo., Richard J. Schreiber, Chicago, Ill., for defendant.

## MEMORANDUM

HATFIELD, District Judge.

The present action for injunctive and declaratory relief has its genesis in a dispute between the plaintiff, Brotherhood of Locomotive Engineers ("Brotherhood") and the Burlington Northern Railroad Company ("BN") concerning the validity of the BN's unilateral implementation of a program designed to deter the on-duty use of intoxicat-

ing substances by train crew personnel. The Brotherhood and the BN are parties to a collective bargaining agreement, subject to the provisions of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.* Jurisdiction of this action vests with this court under authority of 28 U.S.C. § 1331 and § 1337.

On October 5, 1984, the court entered a preliminary injunction maintaining the status quo of the relationship between the parties pending resolution of this matter upon the merits. Trial upon the facts without a jury commenced on November 13, 1984. After the Brotherhood completed the presentation of the case in chief, the parties informed the court that settlement of the controversy appeared imminent. At the request of the parties, trial was recessed pending negotiations between the parties. When the anticipated settlement never materialized, the court reconvened trial on February 13, 1985.

Having considered the evidence presented by the parties, and applying the pertinent law to the facts as found to exist, the court enters the present memorandum as its findings of fact and conclusions of law, pursuant to Rule 52, Federal Rules of Civil Procedure.

FACTUAL BACKGROUND

The plaintiff Brotherhood is a labor organization representing the craft of locomotive engineers employed by the BN. The defendant BN is a corporation engaged in transporting goods and commodities by rail. Both parties are subject to the provisions of the RLA.

At all times material to this action, and for a period of at least forty years, the Brotherhood and BN have been parties to various collective bargaining agreements governing the rates of pay, rules and working conditions as negotiated between the parties. During that same period of time, the BN has had a unilaterally implemented safety rule in effect, denominated Rule G, which provides:

The use of alcoholic beverages, intoxicants, narcotics, marijuana, or other controlled substances by employees subject to duty, or their possession or use while on duty or on company property is prohibited. Employees must not report for duty under the influence of any marijuana, or other controlled substances, or medication, including those prescribed by a doctor, that may in anyway adversely affect their alertness, coordination, reaction, response or safety.

Any on-duty employee found to be in violation of the proscriptions contained in Rule G would be subject to suspension or discharge in accordance with established procedure. Prior to May 1984, the BN relied primarily upon the sensory observations of security personnel to detect violations of Rule G. If a supervisor had reason to believe that a particular on-duty employee was under the influence of an intoxicating substance, the supervisor would further investigate and, if warranted, remove the employee from service, pending a formal investigation via established procedures.

In May 1984, shortly after several tragic accidents occurred on its rail system, the BN intensified its efforts to enforce Rule G. At that time, the BN unilaterally implemented a surveillance and search program designed to curtail or prevent the "on-duty" use of alcohol and controlled substances by its employees. That surveillance-search program was based primarily, if not exclusively, on the use of dogs trained to detect the presence of drugs or controlled substances. The BN utilized the dogs to inspect the personal effects, including automobiles, of on-duty employees to detect the presence of substances prohibited by the terms of Rule G. The employees subjected to such inspections were chosen on a random basis. Although the BN may have chosen a particular locale to conduct an inspection on the basis of a suspected high incidence of violations, the existence of a reasonable belief that a particular employee was in violation of Rule G was not a prerequisite to inspection.

Upon receiving a positive indication from a dog that a controlled substance was in a particular employee's possession, BN's se-

curity personnel would ask that employee to consent to a physical search of his personal effects. If an employee refused to submit to inspection in the first instance, or to sign a consent form permitting a physical search after a positive indication, the employee was removed from service, charged with a violation of Rule G and threatened with discipline and loss of employment.

## DISCUSSION:

The Brotherhood contends that the collective bargaining agreement extant between the parties[1] was violated by the BN's unilateral implementation of its surveillance-search program, the cornerstone of which is the random utilization of dogs trained to detect the presence of drugs, or controlled substances, in the possession of "on-duty" employees, *i.e.*, an employee who has reported for work.

The unilateral implementation of the surveillance-search program, the Brotherhood submits, constitutes a change in "working conditions" accomplished in violation of the notice, negotiation and mediation requirements imposed by § 2 in conjunction with

§ 6 of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 152 and 156.[2]

The BN counters by vehemently asserting that the method of enforcing the proscriptions contained in its long standing safety rule regarding the use of intoxicating substances by employees, *i.e.*, Rule G, is not a matter subject to the collective bargaining process. Rather, the BN submits, the implementation of safety rules like Rule G and the method by which those rules are enforced is a matter within the prerogative of the employer. In the alternative, the BN takes the position that even if the method by which Rule G is enforced is viewed as a matter properly determined through collective bargaining, the propriety of its unilateral implementation of the surveillance-search program presents a dispute which must be resolved in accordance with the procedures established by Section 3, First (i), of the RLA, 45 U.S.C. 153.[3] In that regard, the BN contends that the dispute revolves around the interpretation and application of the collective bargaining agreement extant between the parties.

The issue of whether a particular dispute arising under the RLA falls within the purview of § 2 or § 3 of that act is a classic

---

1. The great majority of the Brotherhood's members now employed by the BN are governed by *one of four collective bargaining agreements* entered into by predecessor companies of the present BN. The provisions of those agreements pertinent to this action are identical. Therefore, for purposes of clarity the four agreements shall be referred to collectively as one throughout the present memorandum opinion.

2. 45 U.S.C. § 152 Seventh provides:

 No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 6 of this Act.
 45 U.S.C. § 156, in turn, provides:
 Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every

case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon as required by section 5 of this Act, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

3. 45 U.S.C. § 153, First (i) provides:

 The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, ... shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

one which has spawned extensive litigation in the federal courts. The litigation emanates from the fact that the distinction between the two classes of disputes, the former being referred to as "major," the latter as "minor," is important from both a substantive and procedural standpoint.[4] The classification has far reaching consequences in respect to the timing and role of the judicial function, including the jurisdiction of the courts themselves. *O'Donnell v. Wien Air Alaska, Inc.,* 551 F.2d 1141, 1145 (9th Cir.1977). Section 3 of the RLA commits resolution of minor disputes to the exclusive jurisdiction of the Railroad Adjustment Board, or to mediation procedures on which the parties have agreed, thereby depriving the parties of access to federal court for resolution of the dispute. 25 U.S.C. § 153 First (i); *see, Brotherhood of Railroad Carmen v. Pacific Fruit Express Company,* 651 F.2d 651 (9th Cir. 1981).

Section 2 in conjunction with § 6, on the other hand, establishes a distinct mechanism for settlement of major disputes, designed to encourage resolution through mediation under the auspices of the National Mediation Board, and ultimately arbitration, if necessary. 45 U.S.C. §§ 152 Seventh and 156; *see, Elgin, Joliet and Eastern Railway Co. v. Burley,* 325 U.S. at 724–25, 65 S.Ct. at 1290–91. The mechanism for resolving major disputes is deliberately designed to be a long and drawn out, almost interminable, process during which the parties are obligated to maintain the status quo. *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union,* 396 U.S. 142, 148–49, 90 S.Ct. 294, 298–99, 24 L.Ed.2d 325 (1969). Because the status quo requirement of § 6 is central to the RLA's design, the parties to a major dispute have immediate access to federal court for the purpose of obtaining injunctive relief, to prevent the adverse party from attempting to alter the status quo pending exhaustion of the dispute resolution mechanism contained in § 6. 396 U.S. at 150–51, 90 S.Ct. at 299; *see also, O'Donnell v. Wien Air Alaska, Inc.,* 551 F.2d at 1148. An injunction may issue under such circumstances regardless of whether a showing of irreparable harm has been made by the moving party. 396 U.S. at 150–51, 90 S.Ct. at 299.

In the case at bar, the court is called upon to determine whether the dispute between the Brotherhood and the BN, concerning the latter's unilateral implementation of its surveillance-search program, is properly characterized as a major or minor dispute. Resolution of that issue, in turn, determines the propriety of maintaining the status quo pending resolution of the dispute in accordance with the appropriate provisions of the RLA. Disposition of the issue requires the court to undertake a two step analysis. First, the court must address whether the method which may be employed to detect violations of Rule G, the safety rule at issue, is properly a matter of negotiation and hence a "working condition" within the meaning of §§ 2 Seventh and 3 First(i) of the RLA. An affirmative answer to that first inquiry will necessitate a determination whether resolution of the dispute merely entails an interpretation of the agreements extant between the parties *i.e.,* a minor dispute, or whether the unilateral implementation of the surveillance-search program constitutes a change in the agreements between the parties affecting

---

**4.** The terms "major" dispute and "minor" dispute were first coined by the United States Supreme Court in *Elgin, Joliet & Eastern Railway Company v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1944), to describe the disputes falling within § 2 and § 3 of the RLA respectively. The Court in *Elgin* described major disputes as those "over the formation of collective agreements or efforts to secure them. They arise where there is no agreement or where it is sought to change the terms of one. . . ." 325 U.S. at 723, 65 S.Ct. at 1289; *see also, Switchmen's Union of North America v. Southern Pacific Company,* 398 F.2d 443, 445 (9th Cir.1968). The Court in *Elgin* contrasted minor disputes as those which "relate either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." 325 U.S. at 723, 65 S.Ct. at 1289, *see also, Switchmen's Union of North America v. Southern Pacific Co.,* 398 F.2d at 445.

working conditions of the employees of the BN, *i.e.*, a major dispute.

## WORKING CONDITIONS

■ In order to effectuate the purposes of the RLA envisioned by Congress, courts must afford the term "working condition" broad interpretation. *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. at 152–53, 90 S.Ct. at 300–01; *see also, United Transportation Union v. St. Paul Union Depot Co.*, 434 F.2d 220, 223 (8th Cir.1970), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971). Consequently, the term has been construed to include those actual, objective working conditions out of which a particular dispute arises and which may not necessarily be covered in an existing collective bargaining agreement. *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. at 153, 90 S.Ct. at 301. In that regard, the Supreme Court noted that it would be virtually impossible to include all working conditions in a collective bargaining agreement. 396 at 154–55. Rather, when a particular condition has existed over time because that condition is satisfactorily tolerable to both sides, it may well be omitted from the agreement, a fact especially true in the railroad industry. 396 at 155.

■ Elevation of a particular practice or course of conduct to an implied contractual status, warranting treatment as a working condition under the RLA, requires that the practice or course of conduct achieve the level of an established practice or custom. *See, United Transportation Union v. St. Paul Union Depot Co.*, 434 F.2d at 223. That level is attained when the conduct of the parties exhibits that continuity, interest, and purpose indicative of a mutual understanding as to the terms of the agreement. *See, General Committee of Adjustment v. Burlington Northern Inc.*, 620 F.2d 161, 163 (8th Cir.1980).

5. The collective bargaining agreement contains provisions establishing the procedures to be followed in a disciplinary action emanating from the violation of any operating or safety rule.

The parties in the present action agree that Rule G has been in effect for many years prior to 1980. It is equally undisputed that compliance with the terms of Rule G has been a condition of employment for that same period of time, with employees found to be in violation of its provisions being subjected to suspension or discharge. The text of Rule G, however, neither in its present nor past form, indicates the method by which the rule is to be enforced, or refers to any means which may be utilized to detect violations. Review of the collective bargaining agreement between the parties reveals that no reference is made to Rule G, let alone any statement either condoning or prohibiting any specific method of enforcement or detection with respect to the rule.[5]

Emphasizing that no provision of the collective bargaining agreement between the parties restricts the BN with regard to the methods or procedures for enforcing Rule G, the BN asserts that the method of enforcement or detection is a matter within BN's managerial prerogative. Given that fact, the argument goes, BN's unilateral implementation of a particular method of enforcement or detection does not rise to the level of a labor dispute within the purview of the RLA. The position of BN is not only specious, but blatantly ignores the rationale espoused by the Supreme Court in *Shore Line* as applied to the facts established in this case.

■ The mere absence of any reference in the collective bargaining agreement to a particular method of enforcement or detection, standing alone, does not establish that the method which may be utilized to detect violations is a matter within the prerogative of management. Rather, the conspicuous absence may simply reflect the fact that a particular method, satisfactorily tolerable to both sides, has existed over time. *Detroit & Toledo Shoreline v. United Transportation Union*, 396 U.S. at 155, 90

That provision does not refer to any specific rule nor establish any acceptable or proscribed method of detecting violations of any rule.

S.Ct. at 302. Based upon the evidence produced at trial, the court finds that the parties have indeed acquiesced over time in a particular method by which the BN could detect violations of Rule G by on-duty employees.

█ The evidence of record unequivocally establishes that prior to the implementation of the surveillance-search program in 1984, the enforcement of Rule G was predicated upon sensory surveillance by certain supervisory personnel of the BN, *i.e.*, "trainmasters" or "road foremen". If, on the basis of his observations, a supervisor concluded that an on-duty employee was under the influence of a prohibited substance, the supervisor would conduct a further investigation and, if necessary, ultimately initiate the appropriate disciplinary procedures. The practice which evolved over time was one premised upon a determination, through sensory observation, that cause existed to believe a particular employee was under the influence of a substance prohibited by Rule G. The practice has clearly existed over a substantial period of time, becoming an acceptable method of detection to both the BN and the Brotherhood.[6] The practice exhibits that continuity, interest and purpose indicative of the existence of a mutual understanding as to the terms of the practice which are tolerable by both parties. Affording the term "working condition" the liberal construction to which it is entitled, the court finds the practice of detecting Rule G violations by means of sensory observation of supervisory personnel has achieved the level of an established practice, deserving of an implied contractual status. Consequently, the BN is not at liberty to change the method by which it attempts to detect Rule G violations, except in conformity with the provisions of the RLA.

**6.** The BN presented evidence that it had utilized trained dogs to detect prohibited substances on several occasions beginning in 1977. The BN clearly used the dogs, however, on a limited and sporadic basis. Because of the isolated nature of these previous incidents, the Brotherhood apparently never mounted a major campaign in opposition. The *de minimis* use of the dogs in violation of the implied agreement between the parties, however, even if deemed "successful," does not constitute acquiescence by the Brotherhood culminating in a valid change in that agreement. To conclude otherwise would be condoning a principle which would undoubtedly frustrate the purpose of the RLA.

## MAJOR VS. MINOR DISPUTE

█ Having concluded that the dispute between the parties involves a "working condition," within the meaning of the RLA, the court now turns to the correlative issue of whether the dispute is a "major" or "minor" dispute. Application of the major-minor distinction espoused in *Elgin* to a particular factual situation has caused the courts considerable consternation. The difficulty encountered in characterizing a particular dispute is obviously aggravated when, as in the case at bar, the controversy centers on a working condition established by an implied agreement. Consequently, those courts of appeal which have been presented with novel factual situations have formulated various "tests" in an effort to distinguish the two types of disputes in accordance with the *Elgin* standard. *Local 553, Transport Workers Union v. Eastern Air Lines, Inc.*, 695 F.2d 668, 673–74 (2nd Cir.1982); *Railway Express Agency v. Brotherhood of Railway Airline and Steamship Clerks*, 459 F.2d 226, 231 (5th Cir.1971); *cert. denied*, 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1971); *Airline Stewards Assn. v. Caribbean Atlantic Airlines, Inc.*, 412 F.2d 289, 291 (1st Cir.1969). Although the various "tests" are phrased differently, they appear to be substantively identical. *See, United Transportation Union v. Penn. Central Trans. Co.*, 505 F.2d 542, 544 and n. 5 (3rd Cir.1974).

The leading case in this circuit with respect to the major-minor distinction is *Switchmen's Union v. Southern Pacific Co.*, 398 F.2d 443 (9th Cir.1968), which framed the determinative inquiry as a relatively narrow one: Is the position of at least one of the parties *arguably* predicated on the terms of an agreement? *See,*

*O'Donnell v. Wien Air Alaska, Inc.*, 551 F.2d at 1145. The reasoning of the court in *Switchmen's*, which led to this formulation, bears repetition:

> It is true, as the union points out, that a controversy, although couched in terms of a disagreement as to interpretation of a contract, may under some circumstances be regarded as a major dispute. This result may be reached if it can be said that the change being imposed by one side on the other is in nowise contemplated or arguably covered by the agreement. The provisions of the Railway Labor Act may not be avoided merely through the device of unilateral action which the actor purposefully intends shall not become a part of the agreement. The major-minor dispute dichotomy does not relate to artfully contrived formalistic demands or responses, but to matters of substance. (citations omitted)
>
> But where the position of one or both of the parties is expressly and arguably predicated on the terms of the agreement, as illuminated by long-standing practices, the question of whether the position is well taken involves a minor dispute.

398 F.2d at 447.

The *Switchmen's* rule has subsequently been restated in varying factual contexts by the Court of Appeals for this circuit.[7] Nonetheless, the essence of the rule remains the same, *i.e.*, is the disputed action by one of the parties "arguably" justified by the agreement existing between the parties.

The method by which an employer like the BN detects violations of its safety rules, especially a violation which may result in job termination, strikes at the heart of the employer-employee relationship. Consequently, in determining whether an implied agreement exists between the parties with respect to the method of detecting violations, a court must carefully scrutinize the past practices of the parties, since they provide the most reliable means of elucidating the terms of the understanding extant between the parties. Illumination by "long standing practices" is critical to resolving whether the position of one or both of the parties to a dispute is arguably predicated on the terms of the agreement. *See, Switchmen's Union v. Southern Pacific Company*, 398 F.2d at 447. Resort to those past practices of pertinence to the present controversy provides the illumination necessary to resolving the major-minor dichotomy presented.

As noted earlier, the Brotherhood and the BN impliedly agreed that the acceptable method of detecting Rule G violations was one based upon the sensory observations of BN's supervisory personnel. Implicit in that agreement, and a matter conclusively established in the record, is the fact that at least a modicum of evidence must exist that a particular employee is operating under the influence of an intoxicating substance before any further investigation can be conducted by the supervisor.[8] The requisite modicum of evidence must be based on the sensory observations of the supervisor. There is no indication that the practice of randomly searching the

---

7. In *Railway Labor Executives Ass'n v. Atchison Topeka & Santa Fe Ry. Co.*, 430 F.2d 994, 997 (9th Cir.1970); *cert. denied*, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971), the Court essentially restated the *Switchmen's* rule when it stated that if:

> ... the dispute grows out of the employment relationship and, in the final analysis, involves an attempt to impose a right which is incident to that relationship, the statutory forum is the Adjustment Board, absent a clear expression of legislative policy to the contrary.

The Court again rephrased the rule *Southern Pacific Trans. Co. v. United Trans. Union*, 491 F.2d 830 (9th Cir.1974), *cert. denied*, 416 U.S. 985, 94 S.Ct. 2389, 40 L.Ed.2d 762 (1974), when it stated that a dispute is minor when the contract provision is "reasonabl[y] susceptible" to a party's interpretation.

8. The court need not decide whether the quantum of evidence necessary to justify further investigation would be akin to the "reasonable suspicion" or "probable cause" standards which have evolved in our criminal jurisprudence. The term of the agreement between the parties is the only standard of concern.

person or personal effects of employees was ever agreed to, or acquiesced in, by the Brotherhood. In that same vein, there is no evidence suggesting that the personal effects of an employee were searched under any circumstances, let alone on a randomly designed basis, prior to March 4, 1984.

 Based upon the terms of the agreement between the parties regarding the method of detecting Rule G violations, as illuminated by long standing practices, the court finds the BN's practice of randomly searching the person or personal effect of the members of the Brotherhood is not "arguably" justified by the terms of that agreement. The contention of the BN to the contrary is obviously insubstantial. Consequently, the dispute between the parties presents a major dispute subject to the status quo provisions of § 6 of the RLA, 45 U.S.C. § 156.

 The court feels compelled to specifically address one argument advanced by the BN in support of its position. Contrary to the BN's assertion, the present controversy does not fall within the "omitted case" doctrine espoused by the Supreme Court in *Elgin, Joliet & Eastern Ry. Co. v. Burley*, 325 U.S. at 723, 65 S.Ct. at 1289, as applied by the Court of Appeals for this circuit in *Railway Labor Exec. Assoc. v. Atchison, Topeka & Santa Fe Railway Co.*, 430 F.2d at 996–97. The "omitted" case doctrine applies to those situations where a claim is "founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, *e.g.*, claims on account of personal injuries." *Elgin, Joliet & Eastern Ry. Co. v. Burley*, 325 U.S. at 723, 65 S.Ct. at 1289. The "omitted" case only arises where no attempt is being made to change the terms of an existing collective agreement. *Id.* Rather, the claim arises as one normally incident to the employment relation and requires application of the terms of an agreement to the factual situation presented. *Id.*

In resolving the jurisdictional issue presented, the Court in *Railway Labor Exec. Assn. v. Atchinson, Topeka & Santa Fe Railway Co.*, 430 F.2d at 996, held that the National Railroad Adjustment Board had primary jurisdiction to resolve the issues presented in an omitted case. The fact was undisputed in that case, however, that the controversy presented was "minor" in nature. *Id.* That case is clearly distinguishable from the case at bar.

A relatively recent statement by the Supreme Court, emphasizing the purposes of Congress' commitment of minor disputes to the Board of Adjustment, elucidates what this court believes is meant by the term "incident of the employment relation":

Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective bargaining agreements. The Adjustment Board was created as a tribunal consisting of workers and management to secure the prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions. Congress considered it essential to keep these so-called "minor" disputes within the Adjustment Board and out of the courts. (citations omitted).

*Union Pacific R. Co. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978).

 The rationale of *Sheehan* is, of course, consistent with the rationale upon which the major-minor dichotomy was premised in the first instance by the Court in *Elgin*. That same rationale compelled the holding in *Shore Line*, extending § 6 protection to the terms of an implied agreement. The rationale is a pragmatic one, bottomed on recognition of the fact that the RLA is designed to provide a mechanism for the resolution of disputes which will cause the least amount of disruption to railroad traffic. As recognized by the Court in *Shore Line*, the primary objective of the RLA is the prevention of strikes. 396 U.S.

at 154, 90 S.Ct. at 301. Consequently, interpretation and application of the provisions of RLA by the courts, as evidenced by *Elgin, Shore Line* and *Sheehan,* must be tempered with the fundamental purpose of the act in mind. The Court in *Elgin* summarized this proposition in espousing the major-minor dichotomy when it stated:

> ... The [major disputes] present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid. Because they more often involve those consequences and because they seek to create rather than to enforce contractual rights, they have been left for settlement entirely to the processes of noncompulsory adjustment.
>
> The so-called minor disputes, on the other hand, involving grievances, affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment. They represent specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so. Because of their comparatively minor character and the general improbability of their causing interruption of peaceful relations and of traffic, the 1934 Act sets them apart from the major disputes and provides for very different treatment. 325 U.S. at 723–24, 65 S.Ct. at 1289, 1290.

 Affording the terms of the RLA that liberal construction necessary to effectuate the objectives of the act Congress envisioned, this court concludes that the present dispute is clearly not an "omitted" case, but presents a significant "major" dispute. The infringement upon the rights secured the members of the Brotherhood by their collective agreement with the BN which the surveillance-search program at issue would entail constitutes, in the colloquial, the "stuff" of which strikes are made.

The complaint filed by the Brotherhood presents a myriad of other issues related to the validity of the procedures utilized by the BN after a positive indication of the presence of drugs was made by one of the trained dogs. In view of the court's conclusion that the random use of the dogs presents a "major" dispute under the RLA, the court need not reach those issues.

An appropriate order shall issue.