**RAILWAY LABOR EXECUTIVES ASSOCIATION, et al., Plaintiffs,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.**

No. 86 C 2064.

United States District Court, N.D. Illinois, E.D.

Jan. 30, 1987.

Marvin Gittler, Stephen Feinberg, Asher, Pavalon, Gittler & Greenfield, Ltd., Chicago, Ill., Jerome M. Alper, Washington, D.C., for plaintiffs.

James S. Whitehead, Linzey D. Jones, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

■ The plaintiffs in this action are eighteen labor unions ("the Unions") whose

members are employed by defendant Norfolk and Western Railway Co. ("N & W").[1] The Unions seek a preliminary injunction enjoining N & W's imposition of a drug screen urinalysis as part of the railroad's routine medical examinations.[2] N & W has moved for summary judgment on the grounds that this claim is a "minor dispute" within the exclusive jurisdiction of the National Railroad Adjustment Board ("NRAB") and is barred by the statute of limitations. For the reasons set forth below, the court denies the Unions' motion for a preliminary injunction and grants N & W's motion for summary judgment.

## Factual Background

N & W has had a long-standing policy against the use of drugs or intoxicants by any of its employees. Rule G[3] of N & W's Operating and Safety Rules expressly prohibits the use or possession of drugs on the railroad's property. The Company's medical examinations require all employees to inform N & W of their consumption of alcohol or use of any prohibited drugs.

For at least twenty years, the railroad has required routine physicals of all its active employees as well as those employees returning from furlough or some other extended absence. These examinations require each employee to submit a urine specimen to the examining doctor for a urinalysis. The purpose of the urinalysis is to detect the level of albumen or sugar in the employee's body (Dr. Ford Aff.). If the urinalysis or any other test conducted in the medical examination indicates that the employee is not physically fit for his job, the railroad may suspend the employee from service until the disability subsides. Prior to 1984, N & W did not employ any medical tests to detect an employee's use of drugs or alcohol.

In 1984, Dr. George W. Ford, N & W's Medical Director, became concerned about the need to utilize a more scientific method for determining an employee's possible lack of fitness for work because of his alcohol or drug use. After consulting with N & W's management, it was determined that the urine samples, already a staple of the railroad's routine medical examinations,

1. The Unions joined as plaintiffs in this action are the Railway Labor Executives' Association; the American Railway and Airway Supervisors Ass'n., Division of BRAC; the American Train Dispatchers Association; the Brotherhood of Locomotive Engineers; the Brotherhood of Railroad Signalmen; the Brotherhood of Railway, Airline & Steamship Clerks, Freight Handlers, Express and Station Employees; the Brotherhood of Railway Carmen of the United States and Canada; the Hotel Employees & Restaurant Employees International Union; the International Association of Machinists and Aerospace Workers; the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers; the International Brotherhood of Electrical Workers; the International Brotherhood of Firemen and Oilers; the International Longshoremen's Association; the National Marine Engineers' Beneficial Association; the Seafarers' International Union of North America; the Sheet Metal Workers International Association; the Transport Workers Union of America; and the United Transportation Union.

As an initial matter, N & W argues that the Hotel Employees and Restaurant Employees International Union, the International Longshoremen's Association, the Seafarers' International Union of North America and the Transport Workers Union of America should be dismissed from the lawsuit because they do not represent any employees who have a collective bargaining relationship with N & W. *See* Steele Aff., Ex. 1,

¶ 2 to N & W's motion for summary judgment. Since these unions have not presented any evidence to indicate that they are properly joined as plaintiffs in this lawsuit, the court grants N & W's motion to dismiss them from the case.

2. The complaint also alleges that N & W has imposed a policy requiring breathalyzers and blood tests of its employees. There is nothing in the record to indicate that N & W has adopted any policies with respect to either breathalyzers or blood tests. Accordingly, the court dismisses the Unions' claims with respect to these tests at the outset.

3. Rule G provides:

An employee who reports for duty under the influence of alcohol or other intoxicant, canabis in any form, an amphetamine, a narcotic drug, a hallucinogenic drug, any controlled substance (as defined by federal law), or a derivative or combination of any of these, or who uses any of the foregoing while on duty, will be dismissed. Possession of any of the foregoing while on duty, or possession, use, or being under the influence of any of the foregoing while on Company property or occupying facilities provided by the Company, is prohibited.

Steele Aff., Ex. 1 to N & W's Motion for Summary Judgment.

could also be used to determine the presence of drugs or alcohol in an employee's body. The company decided to implement a drug screen in conjunction with its medical examination urinalyses in October of 1984.

This new procedure merely provided that two tests would now be performed on the employee's urine sample. A portion of the sample would continue to be used for the testing of albumin and sugar, and the remaining portion would be shipped to a drug testing center to determine the presence of drugs in the employee's bloodstream. Prior to October 18, 1985, N & W did not permit any employees to return to service pending the results of the drug screen urinalysis. The policy was changed as of that date, and an employee may now commence work prior to N & W's receipt of the drug test results, so long as the employee does not have any other medical condition which requires withholding him from work (Dr. Ford Aff. ¶ 17).

If the laboratory drug tests reveal a positive trace of drugs in the employee's system, the employee is notified by letter that he will not be permitted to return to service until he submits a urine specimen that tests negative for the presence of drugs. The Medical Department's policy requires submission of this second urine sample within 45 days of the notification to the employee. Failure to comply with this directive within 45 days can result in dismissal for failure to obey instructions. Once the employee provides the negative urine sample, he will be allowed to return to work immediately. The Medical Department may also require follow-up examinations from time to time to determine the employee's continuing fitness for work.

An employee who tests positive for drugs may also elect to participate in the Norfolk Southern Drug and Alcohol Rehabilitation Services Program ("DARS"). An employee participating in this program does not have to provide a second urine sample until five days after he leaves the program.

N & W began to inform the unions of its intention to add the drug screen urinalysis to its routine medical exams shortly after the policy was adopted in October of 1984. In December of 1984, R.C. Steele, N & W's Assistant Vice-President of Labor Relations, notified nine of the Unions [4] of the new policy. Dr. Ford met with union representatives in January of 1985 to discuss the new policy. In response to the representatives' request for individual notice regarding the drug screen urinalysis, N & W sent a notice of this new medical policy to all N & W employees on February 12, 1985. The notice informed them of N & W intention to conduct a drug screen urinalysis in connection with every medical exam and the consequences of a positive test result.

N & W spoke with Union representatives in February, March and July of 1985, and issued a second notice of the medical policy to all employees on August 1, 1985 [5] (Ex.

---

4. The Unions notified were: the United Transportation Union; the Brotherhood of Locomotive Engineers; the International Association of Machinists; the Brotherhood of Railway, Airline & Steamship Clerks, Freight Handlers, Express and Station Employees; the Brotherhood of Railway Carmen of the United States and Canada; the American Railway and Airway Supervisors Association; the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers; the International Brotherhood of Firemen and Oilers; and the Brotherhood of Railroad Signalmen. Steele Aff., Ex. 1, ¶ 4.

5. N & W discussed the drug testing policy with a representative of the International Brotherhood of Electrical Workers on February 13, 1985; and met with a representative of the Sheet Metal Workers International Association on March

4, 1985. In July of 1985, N & W's Labor Relations staff contacted ten unions directly to inform them of the railroad's intention to issue a second notice to all the employees in August. The Unions contacted were: the American Railway and Airway Supervisors Association; the American Train Dispatchers Association; the Brotherhood of Railroad Signalmen; the Brotherhood of Railway, Airline & Steamship Clerks, Freight Handlers, Express and Station Employees; the Brotherhood of Railway Carmen of the United States and Canada; the International Association of Machinists; the International Brotherhood of Electrical Workers; the International Brotherhood of Firemen and Oilers; the National Marine Engineers' Beneficial Association; and the Sheet Metal Workers International Association. *See* Lyons Aff., Ex. 9; Steele Aff., Ex. 1 to N & W's Motion for Summary Judgment.

13 to N & W's Motion for Summary Judgment). The Norfolk Southern Corporation, N & W's parent, also published notice of the new policy in its company newsletter in November of 1985 (Ex. 14 to N & W's Motion for Summary Judgment).

The Unions filed the present action on March 25, 1986. They allege that N & W's addition of this drug-screen test to the urinalysis conducted in connection with its routine medical examinations constitutes a unilateral change in employee "working conditions" in violation of Section 2, Seventh and Section 6 of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 152, Seventh and 156.[6] According to the Unions, this court has jurisdiction over the lawsuit because their challenge to the drug screen constitutes a "major dispute" under the RLA. N & W asserts that the Unions' objection is a "minor dispute" which must be referred to the NRAB prior to the institution of a lawsuit in federal court. *See* 45 U.S.C. § 153.[7]

The RLA does not define the distinction between a major dispute, which is subject to federal court intervention, and a minor dispute, which is subject to the exclusive jurisdiction of the NRAB. The Supreme Court coined these terms in an attempt to explain the distinction between challenges under Section 2 and Section 3 of the RLA in *Elgin, Joliet & Eastern Railway Co. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). In that case, the Court held that major disputes are those arising

> over the formulation of collective bargaining agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.... [They are] the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid.

*Id.* at 723–24, 65 S.Ct. at 1290. These major disputes are distinguishable from minor disputes, which

> [contemplate] the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.... [T]he claim is

---

**6.** 45 U.S.C. § 152, Seventh provides:

> No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

45 U.S.C. § 156 provides:

> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

**7.** 45 U.S.C. § 153, First, provides for the establishment of the NRAB, and defines the disputes within its jurisdiction:

> (i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1984, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

to rights accrued, not merely to have new ones created for the future.... [Minor disputes] seldom produce strikes.... *Id.* at 723–24, 65 S.Ct. at 1289–90 (footnote omitted). Thus, if a proposed practice is clearly outside the terms of the collective bargaining agreement, the dispute is characterized as a "major dispute," and the railroad cannot unilaterally impose the proposed practice. On the other hand, if the practice is arguably permissible under the collective bargaining agreement, then the railroad may act unilaterally, and disputes over the procedure must be resolved, at least initially, in an arbitration process before the NRAB. *Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad Co.*, 802 F.2d 1016, 1017 (8th Cir.1986); *International Ass'n of Machinists and Aerospace Workers, AFL–CIO*, 639 F.Supp. 100, 102 (W.D.Wash. 1986); *Air Line Pilots Ass'n v. United Air Lines, Inc.*, 637 F.Supp. 215, 217 (N.D.Ill. 1986).

■ In determining whether a suit involves a major or minor dispute, the court must ascertain whether the conflict can be resolved by reference to an existing collective bargaining agreement. *Atcheson, Topeka & Santa Fe Railroad v. United Transportation Union*, 734 F.2d 317, 321 (7th Cir.1984). The collective bargaining agreement includes those terms contained in the written agreement as well as any "course of dealing" based upon an employer's established practice. *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 153–54, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969); *Maine Central Railway Co. v. United Transportation Union*, 787 F.2d 780, 782 (1st Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986); *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 620 F.Supp. 163, 169 (D.Mont.1985). Since the Railroad's medical examination policies are not contained in the collective bargaining agreement, the court must determine, as an initial matter, whether these practices constitute an implied condition of the working relationship of the parties. *Detroit & Toledo Shore Line Railroad, supra.* "The

test is whether an employer's prior practices 'achieved the level of established practices.'" *Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad Co.*, 642 F.Supp. 41, 45 (N.D.Ia. 1985), *aff'd in relevant part,* 802 F.2d 1016 (8th Cir.1986) (citation omitted). The level of established practices is attained when the conduct of the parties demonstrates "that continuity, interest and purpose indicative of a mutual understanding as to the terms of the agreement." *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 620 F.Supp. 163, 169 (D.Mont.1985).

■ N & W's right to require medical examinations is clearly an established practice recognized by the parties to the collective bargaining agreement. The Unions admit that these examinations are part of the agreement between the parties, and are governed by rules unilaterally promulgated by N & W. They have never objected to N & W's requirement of a periodic physical examination of employees which includes a urinalysis; nor have they objected to any other changes in the battery of tests used by N & W in its physical examinations.

■ Having concluded that N & W's medical examinations deserve implied contractual status, the court must now determine whether the addition of a drug screen urinalysis constitutes a major or minor dispute. The Seventh Circuit has emphasized that, where the parties disagree with respect to whether an existing contract or past practice permits the challenged action, the dispute is minor *unless* the carrier's claimed contractual justification is "frivolous" or "obviously insubstantial." *Atcheson, Topeka & Santa Fe, supra,* 734 F.2d at 321. *See also Maine Central Railway Co.,* 787 F.2d at 782 (court's role is limited to determining whether the railroad's assertion is "even arguable"); *Switchman's Union v. Southern Pacific Co.,* 398 F.2d 443, 447 (9th Cir.1968) (court must determine if the position of one of the parties is arguably predicated on the terms of the agreement). When in doubt, the courts generally construe disputes as mi-

nor. *Atcheson, Topeka & Santa Fe, supra,* 768 F.2d at 920.

█ Thus, the issue for the court is whether N & W's use of an employee's urine sample to conduct an additional test to determine his fitness for work is arguably based on the contract between the parties. The court finds that the record supports N & W's claim that inclusion of this second component to the standard urinalysis is authorized by the past practices of the parties. The Unions have always accorded N & W complete authority to determine the appropriate tests for its medical examinations. This new test is not such an extreme departure from the prior tests conducted in the course of routine medical examinations that N & W should have to engage in collective bargaining over the issue before it can implement it. Therefore, under the facts of this case, the court concludes that N & W's allegation that the parties' existing agreement permits this new test cannot be characterized as frivolous.

The Unions argue that N & W's addition of the drug screen test to the urinalysis already conducted in the course of a routine medical examination represents a change in the manner in which N & W detects violations of Rule G, the safety rule prohibiting use of drugs by active employees. *See supra* note 2. They assert that this test is a change in the working conditions because, prior to this time, N & W's detection of Rule G violations was limited to observations by supervisory personnel. The Unions rely principally on a district court case, *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.,* 620 F.Supp. 163 (D.Mont.1985), *appeal pending,* No. 85–4138 (9th Cir. argued July 8, 1986) ("BLE I"), in support of this argument. In *BLE I,* the Burlington Northern ("BN") unilaterally imposed a program designed to detect the use of on duty intoxicants. Prior to May of 1984, BN relied primarily on sensory observations of supervisory personnel to detect Rule G violations. In May of 1984, BN intensified its efforts to detect these violations by adopting a new surveillance-search program based primarily on the use of dogs to detect the presence of drugs. Employees were subjected to "dog sniffs" on a random basis. Failure to submit to a search after a positive dog sniff resulted in dismissal for violation of Rule G. *BLE I,* 620 F.Supp. at 166–67.

The District Court held that BN's adoption of the policy was a major dispute, and enjoined BN from enforcing the policy. It rejected BN's argument that methods of enforcing Rule G were not subject to the collective bargaining agreement and that the issue presented a minor dispute subject to the exclusive jurisdiction of the NRAB. The court held that "the practice of detecting Rule G violations by means of sensory observation of supervisory personnel has achieved the level of an established practice, deserving of an implied contractual status." *BLE I,* 620 F.Supp. at 170. It found that addition of the dog sniff test changed the working relationship of the parties because it permitted random searches without cause, while the prior method had limited searches to those based on "modicum" of evidence. *Id.,* 620 F.Supp. at 171–72.

The plaintiffs in *BLE I* also objected to BN's implementation of a mandatory urine-testing policy. In a separate opinion, the same court held that BN could not utilize drug screen urinalyses on a random basis to detect Rule G violations, but it could require a urinalysis test when an employee is believed to have violated an operating rule violation. The latter circumstance is "arguably justified" by the contract, and involves a minor dispute subject to the exclusive jurisdiction of the NRAB. *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.,* 620 F.Supp. 173, 175 (D.Mont.1985) ("BLE II").

In contrast to the dog sniffs in *BLE I,* N & W has not made any unilateral changes in its enforcement of Rule G. It still relies on sensory observations to detect violations of Rule G. The record before the court does not support the Unions' argument that the medical policy was implemented in order to detect Rule G violations, and not to ensure an employee's fitness for the

job.[8] Although Rule G and the new medical policy have a similar objective (elimination of drug use among employees), infractions of the policy and the Rule produce much different results. If an employee violates Rule G, he is subject to immediate dismissal. In contrast, if an employee's drug test reveals a positive presence of drugs, the employee is given the option of entering the DARS program or providing a drug-free urine sample within 45 days of the negative test results. Unlike Rule G, the drug screen does not punish an employee for using drugs; it merely forbids him from reporting to work until he can demonstrate that his system is drug-free. Under the new medical policy, the examinations are not random searches of employees; they are conducted in the same manner and with similar frequency as the medical examinations in the past. Accordingly, the court finds that the fact that the medical policy contains a similar objective to Rule G does not undermine N & S's defense that this urinalysis testing is supported by the parties' prior accepted conduct with respect to medical examinations.[9]

*Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad Co.*, 642 F.Supp. 41 (W.D.Ia.1985), *aff'd in part, rev'd in part*, 802 F.2d 1016 (8th Cir.1986) ("BMWE"), also fails to support the Unions' characterization of this issue as a major dispute. This case addressed BN's unilateral change in its method of detecting drug abuse on the job. BN had implemented three methods for determining Rule G violations: sniffer dogs, blood and urine testing following an accident, and drug screen urinalysis in physical examinations of all returning furloughed employees.

The District Court adopted the findings of two *BLE* decisions with respect to the use of sniffer dogs and urinalysis after an accident. *BMWE*, 642 F.Supp. at 46–47. With respect to the drug screens of furloughed employees, however, the court held that the railroad's new policy, which added both the requirement of a physical examination *and* a drug screen in connection therewith, involved a major dispute under the RLA. *Id.* at 47. The court characterized it as a "random search" outside the scope of the railroad's accepted practice of enforcing Rule G.

██ The Eighth Circuit reversed the district court's conclusion that urinalysis of furloughed employees involves a major dispute under the RLA. *Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad Co.*, 802 F.2d 1016 (8th Cir.1986) (per curiam). The court held:

> BN's past practice of requiring employees to submit to periodic and comprehensive medical examinations in order to ensure all employees are fit for duty is not challenged.... Basically, ... the parties dispute ... the extent to which the urinalysis component of these examinations may be refined in order to predict safe employee performance.
>
> It is beyond dispute the drug screen is a new technique; the underlying purpose

---

**8.** As set forth earlier, the Unions have never objected to N & W's examination of a urine sample to determine an employee's fitness for work. The fact that N & W now subjects the sample to two tests, both arguably related to an employee's fitness, cannot be characterized as a major dispute which authorizes federal court intervention. Unlike the circumstances in *BLE I*, there is no suggestion that N & W imposes its drug testing on a random basis. An employee is not supposed to be pulled from active service to conduct a random test; the policy requires a drug test after an on-site accident only if the facts suggest that the accident was related to the improper use of intoxicants. *See* Exs. 15, 30 to N & W's Motion For Summary Judgment. Following *BLE II*, even if this medical policy were adopted to detect Rule G violations, it would still involve a minor dispute under the RLA.

**9.** This court need not delve into the merits of N & W's alleged contractual justification for its conduct; it is sufficient that the court finds that N & W's conduct rests on an interpretation of the parties' collective bargaining agreement which is not frivolous or obviously insubstantial. *United Transportation Union v. Baker*, 499 F.2d 727, 731 (7th Cir.1974); *Air Line Pilots Ass'n International v. United Air Lines, Inc.*, 637 F.Supp. 215, 218 (N.D.Ill.1986); *Burlington Northern Railroad Co. v. Sheet Metal Workers International Ass'n*, 636 F.Supp. 809, 813 (N.D. Ill.1986). The determination of the validity of this policy under the contract will be ultimately determined by the NRAB.

of the medical examinations, however, remains the same—to ensure all BN employees are fit for duty. The drug screen is nothing more than a method designed to detect the presence of a newly emerging threat to that fitness.

The use of a more comprehensive urine test has not significantly changed the ground rules between BN and the union. It should come as no surprise to the parties that the components of a work fitness medical examination will change with the times. Because BN and the union are involved in a dispute over the scope of BN's actions designed "to ensure that all employees are fit for duty" —actions which are arguably justified— this dispute should be submitted to the National Railroad Adjustment Board.

*Id.* at 1024. This court agrees with the reasoning of the Eighth Circuit, and finds that N & W's addition of the drug test to its urinalysis test in all physical examinations is "arguably justified" by the past practices of the parties. The policy thus involves a minor dispute between the Unions and N & W.[10]

As a final matter, the court also notes that the Unions have pursued grievances relating to railroad medical policies as minor disputes. Several instances of alleged improper imposition of medical policies, including the medical policy at issue in this case, have been appealed to the NRAB and

Public Law Boards pursuant to 45 U.S.C. § 153 in the past (*see* Ex. 23–28 to N & W's Motion for Summary Judgment). These actions indicate that the Unions impliedly admit that N & W's defense of contractual justification is not frivolous.

### Conclusion

For the reasons set forth above, the court finds that N & W's imposition of a drug screen urinalysis involves a minor dispute subject to the exclusive jurisdiction of the NRAB under 45 U.S.C. § 153. Accordingly, the court grants N & W's motion for summary judgment and denies the Unions' motion for a preliminary injunction.[11]

---

**10.** The Unions also argue that N & W's new medical policy is actually an impermissible attempt to impose recently enacted regulations for employees covered by the Hours of Service Act, 45 U.S.C. 61, *et seq.*, to non-covered employees. On July 29, 1985, the FRA promulgated the "Control of Alcohol & Drug Use" rule, 49 C.F.R. § 219. By its terms, the Rule became effective on November 1, 1985. The Rule applies only to employees covered by the Hours of Service Act, 45 U.S.C. § 61, and does not apply to noncovered employees or employees returning from furlough. The Unions assert that N & W's new medical policy is actually an improper attempt to impose this Rule on the employees exempted from its provisions (*i.e.*, noncovered employees and those returning from furlough). The court finds that this allegation does not undermine N & W's defense of contractual justification, especially since N & W adopted and implemented its medical policy nine months before the promulgation of the Rule, and thirteen months before its effective date. The fact that N & W adopted

its policy within a similar time framework that the FRA promulgated a rule on the same subject is insufficient to render N & W's contract defense "frivolous" or "obviously insubstantial."

**11.** The court also notes that, even if this lawsuit involved a major dispute, it may be barred by the statute of limitations. In *Brotherhood of Locomotive Engineers v. Atcheson, Topeka & Santa Fe Railway Co.*, 768 F.2d 914, 919 (7th Cir.1985), the Seventh Circuit adopted a six-month statute of limitations for claims under 45 U.S.C. §§ 152 and 156. *See also International Ass'n of Machinists & Aerospace Workers v. Aloha Airlines, Inc.*, 781 F.2d 1400, 1408 (9th Cir. 1986); *Robinson v. Pan American World Airlines, Inc.*, 777 F.2d 84, 89 (2d Cir.1985). The record reveals that at least nine of the plaintiffs were notified of the policy in December of 1984, and all of the plaintiffs had received notice by August of 1985. This complaint was filed at least nine months after N & W informed them of the new policy.