## AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Plaintiff,

v.

## NORTHWEST AIRLINES, INC., Defendant.

### No. 4–77–Civil–191.

United States District Court,
D. Minnesota,
Fourth Division.

June 6, 1977.

Robert S. Savelson, Cohen, Weiss & Simon, New York City, and J. Michael Dady, Lindquist & Vennum, Minneapolis, Minn., for plaintiff.

David Ranheim, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., for defendant.

MEMORANDUM & ORDER

DEVITT, Chief Judge.

The principal issue raised by plaintiff's motion for a preliminary injunction is whether the change in maximum pilot duty hours occasioned by defendant's institution of nonstop jet service from Chicago, Illinois to Tokyo, Japan has given rise to a "major" or "minor" dispute within the meaning of the Railway Labor Act, 45 U.S.C. § 151, *et seq.* (1970). The matter was initially presented on plaintiff's application for a temporary restraining order. However, in the course of the hearing on that application on June 3, 1977, both parties agreed to consolidate the temporary restraining order and preliminary injunction proceedings, thereby establishing the present posture of this case.

The present dispute originated shortly after defendant, in order to meet substantial competitive pressures, decided to initiate four-day-a-week nonstop service from Chicago to Tokyo and return. This decision was made sometime in the winter of 1977 with the first flight scheduled to depart Chicago on June 8, 1977. Plaintiff learned of this situation in March of 1977. Since it felt that the hours which a pilot would be required to fly under this schedule exceeded the duty hour limitations in the current collective bargaining agreement, plaintiff included a proposal to negotiate these duty hours in its notice of contract negotiations served on March 28, 1977. This notice, which in addition to the proposal concerning the nonstop service, included a comprehensive proposal for a new agreement to take effect upon the June 30, 1977 expiration of the current agreement, was served pursuant to Section 28E of the collective bargaining agreement and Section 6 of the Railway Labor Act, 45 U.S.C. § 156 (1970).

Defendant served its notice of negotiation a few days later. It agreed that the duty hour limitation for the nonstop service could be properly discussed for inclusion in the new contract. However, it maintained and continues to contend that under the existing agreement, it has the sole power to

determine the number of hours a pilot must fly on the nonstop service as long as it adheres to the minimal, safety-oriented limitations contained in a provision of the Federal Air Regulations (FAR's), 14 C.F.R. § 121.485 (1977). Informal negotiations have not borne fruit, and plaintiff now asks the court to enjoin the flights pending exhaustion of the settlement procedures mandated by the Railway Labor Act.

The legal principles which govern this dispute are clear. The starting point is 45 U.S.C. § 152 First and Second (1970) which obligates the parties to negotiate and attempt to voluntarily settle all disputes arising from the employer-employee relationship. Failing settlement at this stage, one of the two different statutory settlement mechanisms is activated, depending upon whether the dispute is major or minor. *Elgin, Joliet, and Eastern Ry. Co. v. Burley,* 325 U.S. 711, 723–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945). Correspondingly, the ability of a party to secure an injunction of the type applied for here varies according to the classification of the dispute. If the dispute is major, an injunction maintaining the *status quo* throughout the settlement process is mandatory without any consideration of the relative equities involved. *United Transportation Union v. Burlington Northern, Inc.,* 458 F.2d 354, 357 (8th Cir. 1972). If the dispute is minor, then a court should be guided by the usual equitable considerations attendant upon the grant or denial of an injunction in order to maximize the primary jurisdiction of the contract grievance machinery and the Airline System Board of Adjustment. *Order of Railway Conductors v. Pitney,* 326 U.S. 561, 567, 66 S.Ct. 322, 325, 90 L.Ed. 318 (1946).

■ Prior to considering the status of this dispute as major or minor, a preliminary matter must be resolved. Plaintiff contended at oral argument that the existence of Section 6 negotiations at the time a court is asked to invoke its injunctive power somehow alters the analytical framework outlined above. This cannot be the case since a party could make any dispute major (thereby triggering the settlement proce-

dures for that type of dispute enforceable by the special statutory injunction) by merely filing notice of Section 6 negotiations. Plaintiff has cited no authority for this contention and seemingly refutes it at page six of its brief where plaintiff concludes that the major dispute provisions are applicable to all attempts to change or modify existing conditions regardless of the existence or non-existence of negotiations. Therefore, the court holds that characterization of the dispute, at least at this preliminary stage, is a task for the judiciary and is unaffected by the existence of contract negotiations.

■ The terms of art, major and minor, are somewhat misleading. Classification turns on questions of contract interpretation rather than the degree of impact on the employment relationship. Major disputes are concerned with formation or amendment of a collective bargaining agreement while minor disputes deal with interpretation or application of an existing contract. *Elgin, Joliet, and Eastern Ry. Co. v. Burley, supra.* Thus, the key issue where an agreement exists is whether its terms provide a resolution to the controversy between the parties. If so, then the dispute is labeled minor, referred to compulsory arbitration, and enjoined only upon plaintiff meeting the normal requirements for an injunction.

However, since the Railway Labor Act is directed toward resolution of disputes through administrative rather than judicial channels, the court's scope of inquiry is narrow. The final characterization of the controversy is left to the appropriate administrative body. The court merely functions as a clearinghouse by preliminarily determining which administrative body should make the final classification. Accordingly, the test is whether the disputed action can be arguably justified by the existing agreement. *Railway Express Agency v. Brotherhood of Railway, Airline, and Steamship Clerks,* 459 F.2d 226, 231 (5th Cir. 1971), *cert. denied,* 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1972). Other courts ask whether the contention that the

contract permits the disputed action is not obviously insubstantial. *Airline Stewards Assn. v. Caribbean Atlantic Airlines, Inc.*, 412 F.2d 289, 291 (1st Cir. 1969). The tests are effectively equivalent in illustrating the limited judicial role in determining the question at issue.

Defendant's contention that the existing contract arguably resolves this dispute is premised on the fact that it plans to use crews composed of five pilots for the new nonstop service. The normal contingent for international flights is three pilots. In fact, Northwest Airlines has not employed crews of more than three pilots since it began using jets in 1960. However, such crews were utilized in the 1950's for piston aircraft. In support of its argument, defendant relies on an alleged implied contract provision established by a negative inference derived from the current agreement's provision regarding duty hour limitations as clarified by the parties' 35 year bargaining history.

The present contract, in Section 12.C.2., limits those pilots assigned to a flight crew consisting of three pilots to scheduled on-duty time of thirteen hours and actual on-duty time of fifteen hours. It is undisputed that both limits will be exceeded with the new service. Defendant contends that this provision is inapplicable to five man crews by its very title—" . . . Pilots assigned to a flight crew consisting of three (3) pilots." Moreover, it argues that since no other terms of the contract are limited to three pilot crews, and since crews consisting of more than three pilots were used in the past and were always intended to be used in the future if the need arose, the parties have impliedly agreed that although all other provisions of the contract apply to the new service, Northwest has the discretion, limited only by the FAR's, to determine pilot duty hours for flights using more than three pilots.

Northwest also points to the bargaining history. Prior to 1964, although the parties regularly bargained with regard to pay, seniority, fringe benefits, etc., the collective bargaining agreement contained no duty hour limitations. The sole restraints on Northwest were the FAR guidelines. In 1964, limitations were prescribed for three pilot crews. Thus, defendant contends, the previous arrangement regarding five pilot crews was intended to remain effective—no duty hour limitations except for the FAR's.

Plaintiff's contentions on this point are more difficult to decipher since most of its brief was devoted to analysis of the *"status quo"* provisions of the Railway Labor Act. In doing so, plaintiff assumed that the dispute was major. However, at oral argument, two points emerged. First, plaintiff contends that by definition, an implied provision depending for its existence upon a negative inference cannot be arguably included in a contract. That is, if the terms do not state the provision, the dispute is not covered by the agreement. In connection with this, plaintiff emphasizes that nowhere in the contract is it provided that the FAR's prescribe the duty hour limitations for crews in excess of three pilots. More practically, plaintiff points out that by 1964, three pilot crews had been established as the norm for international jet flights for at least four years. It is this factual context which must determine the interpretation of the contract. Therefore, plaintiff argues, duty hour limitations for crews of more than three pilots were not bargained for or included in the agreement because such crews did not exist. Subsequent contracts have remained silent on the issue for the same reason.

The court is persuaded that defendant has met its relatively light burden of demonstrating that defendant's action is arguably sanctioned by the collective bargaining agreement. Partial support for this conclusion is found in the arguments outlined above. Courts have regularly concluded that contractual provisions implied from a textural vacuum, as clarified by bargaining history and past practice, arguably control disputes of this nature. *Northwest Airlines, Inc. v. Air Line Pilots Assn. Int'l.*, 442 F.2d 251 (8th Cir. 1971). This approach is in accord with the usual rules of contract interpretation. *United Steelworkers of*

*America v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). In addition, the fact that crews of more than three pilots were not in use at the time the duty hour limitations were negotiated is of no aid to plaintiff. Plaintiff was presumably aware that flights of more than three pilots had been made in the past and that other airlines continued to use such crews. It chose to concede that issue, probably in exchange for concessions in other areas of negotiation. That choice was wise since Northwest had no immediate plans for utilization of flight crews numbering more than three pilots. Plaintiff, after receiving concessions in other areas, cannot now contend that its quid pro quo never existed.

Having determined that the dispute is minor, the court must determine if a preliminary injunction should issue. Plaintiff must show a substantial probability of success on the merits; irreparable harm absent issuance of an injunction; and absence of substantial harm to other interested parties and the public if the injunction is granted. *Chicago Stadium Corp. v. Scallen*, 530 F.2d 204 (8th Cir. 1976) and *Minnesota Bearing Co. v. White Motor Corp.*, 470 F.2d 1323 (8th Cir. 1973). The probability of success issue is intertwined with the major-minor dispute discussion. In order to prevail on the merits plaintiff would have to show that the contract is silent with respect to duty hour limitations. The court has found to the contrary since defendant has demonstrated that its action is arguably permitted by the agreement. The more relevant inquiry focuses on the equitable considerations which form the remaining requirements for the injunction.

Plaintiff's claim of irreparable harm is two-fold, harm to the pilots and harm to the union. Harm to the pilots allegedly stems from the physical demands which will be placed upon them by the longer duty hours and from the disciplinary action which will possibly result if the pilots refuse to fly. It is not clear that the physical demands will be overwhelming. On-board sleeping arrangements will be provided, and the pilots will be rotated in order to insure that a fresh person will always be on duty. In any event, the harm is not irreparable since the pilots will be paid for the extra time according to the terms of the contract. The safety aspects of the new service have been addressed by the FAR's which approve this type of operation. Presumably, pilot objections regarding safety analogous to the arguments raised by plaintiff were aired before the body primarily responsible for safety regulation, the Federal Aviation Administration, and were rejected.

The harm resulting from prospective disciplinary action is speculative. Captain Arnold C. Calvert, chairman of the union negotiating committee, testified that the pilots would probably ignore a union directive to refuse to fly if the injunction were not granted. In addition, this injury would only occur if the pilots unilaterally refused to "fly and grieve." Thus, the harm is self-imposed and insufficient to constitute irreparable harm. Finally, this claim assumes that the dispute is major. If the dispute is minor, as the court has preliminarily held, the pilots have no right to resort to self-help. They must continue to work and pursue the arbitration remedy.

Harm to the union will allegedly be caused by the diminution in union credibility resulting from its current inability to resist Northwest's unilateral alteration of existing working conditions. Again, this claim assumes a major dispute. Since the court has determined that the dispute is governed by the existing contract, Northwest is merely asserting a right that it has always possessed. It has not imposed novel and non-negotiated conditions of employment. Thus, the union's powerlessness stems from its previous bargaining decision, not from any present negotiating weakness.

Northwest points to its substantial expenditures in preparing for the flights as the basis for its claim of irreparable harm. However, this injury would be self-imposed if the court granted the injunction on the ground that the dispute was major. That is, Northwest could not invest in a venture, the imposition of which would require

working conditions not permitted by the contract, and then claim that the loss of this investment constitutes irreparable harm. The harm to those members of the public who have made travel plans in reliance upon the projected nonstop service is worthy of note and supports denial of the injunction.

For the forgoing reasons, plaintiff's motion for a preliminary injunction is DENIED.