BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, LODGE 16, et al., Plaintiffs,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, Defendant.

No. C 85–4072.

United States District Court, N.D. Iowa, W.D.

Oct. 11, 1985.

Harry W. Zanville, Cedar Falls, Iowa, and Lawrence Kudej, Sioux City, Iowa, for plaintiffs.

Richard J. Screiber and Thomas Knapp, Fort Worth, Tex., for defendant.

## ORDER

DONALD E. O'BRIEN, Chief Judge.

The Court has before it plaintiffs' motion for a preliminary injunction. Also before it is defendant's motion to dismiss or stay this action. An evidentiary hearing was held on this matter in Sioux City, Iowa.[1] After carefully considering the briefs, oral arguments, and testimony and evidence presented at the hearing, the Court grants plaintiffs' motion for preliminary injunction in part and denies it in part. The Court also grants defendant's motion to dismiss or stay this action in part.

This dispute arises out of defendant's change in methods of detecting violations of the railroad industry's Rule G policy, which states:

The use of alcoholic beverages, intoxicants, and narcotics, marijuana, or other controlled substances by employees subject to duty, or their possession or use while on duty or on company property is prohibited. Employees must not report for duty under the influence of any alco-holic beverages, intoxicant, narcotic, marijuana or other controlled substance, or medication, including those prescribed by a doctor, that may in any way adversely affect their alertness, coordination, reaction, response or safety.

At all material times, defendant had in effect its safety rules 565 and 566, which are the first and second sentences of Rule G, respectively. Any on-duty employee found to be in violation of the proscriptions contained in Rule G would be subject to suspension or discharge in accordance with established procedure.

The issue before this Court is whether the changes in detection methods for determining Rule G violations constitute "major" disputes. There are basically three different types of detection methods that are being challenged. First, the railroad has used sniffer dogs on its property to determine the presence of drugs.[2] Second, the defendant has utilized blood and urine testing on an employee following an incident in which a rule violation and/or accident occurred for the purpose of determining the presence of drugs and/or alcohol in the employee. Finally, defendant has begun screening for drug and alcohol usage in urine samples given during physicals to its returning furloughed employees.[3]

After reviewing the factual and legal background on this matter, the Court will address each of the testing methods separately.

Plaintiff Brotherhood of Maintenance of Way Employees (BMWE) is a railway labor organization that represents in collective

---

1. At said hearing, this Court flatly told the parties that this was a controversy that could be resolved without a lawsuit; that they should lock themselves in a room and work it out. They did not take the Court up on this, so the Court is issuing this order. Additionally, the Court notes that the injunction was submitted for decision to the Court in June, 1985, and thereafter ruling was delayed because of discovery the parties wished to complete and the tardiness of the stipulation they agreed to submit.

2. Plaintiffs also claim that defendant was involved in other types of random searching such as rummages, search and seizures of employees' belongings, grips and automobiles, as well as wire-tapping and bugging of telephone conversations. However, the Court does not find such claims supported by any evidence.

3. The defendant attempts to persuade both the Court and the plaintiff that such testing is non-punitive and no one will be punished. The plaintiff was certainly not so persuaded and the Court concludes that whether it is true or not is not a decision that needs to now be made by this Court.

bargaining the craft of maintenance of way employees, employed by defendant and is a "representative" of the employees within the meaning of the Railway Labor Act, 45 U.S.C. § 151. Defendant, a corporation duly qualified to do business in Iowa, is engaged in the transportation of goods and commodities by rail in interstate commerce, subject to the Interstate Commerce Act, 49 U.S.C. § 10101, *et seq.*, and the Railway Labor Act, 45 U.S.C. § 151, *et seq.* Both plaintiffs and defendant are parties subject to the provisions of the Railway Labor Act.

For years, the plaintiffs and defendant have been parties to collective bargaining agreements governing rates of pay, rules and working conditions of BMWE members. For several of those years, BMWE employees have been required to comply with Rule G (and rules 565 and 566).

Due to railroad accidents which took several lives, defendant, on and after December 7, 1984, unilaterally began to change the methods of rule detection now in dispute before this Court.

Plaintiffs contend that the collective bargaining agreement between the parties was violated when defendant unilaterally implemented changes in detection methods for Rule G violations. Plaintiff further argues that the implementation of these changes were changes in the "working conditions" and, therefore, constituted "major" disputes. Under section 6 of the Railway Labor Act, a major dispute requires notice, conferences, or reference to the Mediation Board. 45 U.S.C. section 156. Because defendant has done none of these, plaintiffs claim defendant should not be able to implement such changes until it complies with the Railway Labor Act.

Defendant rejects such contentions by arguing that the method of enforcing Rule G is not a matter subject to a collective bargaining process, but rather a matter within the management prerogative of the defendant. Even if the Court is not convinced that such changes are within defendant's prerogative, defendant claims that the changes, at most, constitute a minor dispute. Since defendant has sub-mitted the issue of the changes to the National Railroad Adjustment Board, which both parties agree is the proper forum to resolve minor disputes, 45 U.S.C. § 153, defendant claims it is in compliance with the Railway Labor Act.

Defendant has also submitted a motion to dismiss or stay this action. Besides arguing that this Court has no jurisdiction over the matters since, at most, the changes constitute minor disputes, the defendant originally prayed that this action should be stayed pending determination of very similar cases, *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 620 F.Supp. 163 (D.Mont. 1985) (hereinafter referred to as *BLE I*); and *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 620 F.Supp. 173 (D.Mont.1985) (hereinafter referred to as *BLE II*). Since the date of our hearing on the above set out motions, the Montana district court has made rulings in both cases before it. It is now defendant's position that those Montana rulings govern this case.

In *BLE I*, the issue before the Montana court was whether defendant's use of sniffer dogs on defendant's property created a major dispute. In *BLE II*, the issue before the Court was whether defendant's post-accident testing for drugs and alcohol constituted a major dispute. From reviewing the two decisions, it is clear to this Court that the factual and legal issues presented in them are very similar to those now before this Court.

█ Whether a dispute is major or minor is important for two reasons. First, this Court has only jurisdiction of the dispute if it is "major" since resolutions of minor disputes are within the exclusive jurisdiction of the Railroad Adjustment Board or the mediation procedures on which the parties have agreed. 45 U.S.C. § 153. Second, and as already pointed out, the mechanisms available for dealing with the two types of disputes are significantly different.

■ As was the situation in *BLE I* and *II*, before this Court can reach the question of whether the changes in detection methods for enforcing Rule G constitute major disputes, it must first determine whether the methods are properly a matter of negotiation and therefore a working condition within the meaning of the Railway Labor Act. The term "working condition" is to be broadly interpreted. *Independent Federation of Flight Attendants v. Trans World Airlines*, 655 F.2d 155, 157 (8th Cir.1981); *United Transportation Union v. St. Paul Union Depot Co.*, 434 F.2d 220, 223 (8th Cir.1970), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971). Thus, where a collective bargaining agreement fails to expressly cover a particular condition, but that condition has existed over time because it is tolerable to both sides, it may still be considered a "working condition." *See Detroit and Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142, 153–54, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). The test is whether an employer's past practices "achieved the level of established practices." *Independent Federation of Flight Attendants v. Trans World Airlines*, 655 F.2d at 157. To establish a long-standing custom and practice, the conduct of the parties must encompass a continuity, interest, purpose and understanding which elevates a course of action to an implied contractual status. *General Committee of Adjustment v. Burlington Northern, Inc.*, 620 F.2d 161, 162 (8th Cir.1980).

The parties agree that Rule G has been in effect for many years. The evidence is clear that the terms of Rule G have been a condition of employment for as long as defendant has followed the rule, with employees found to be in violation of its provisions being subjected to suspension or discharge. While Rule G, by itself, does not indicate a method of enforcement, the Court finds, as did the court in *BLE I* and *II*, that the parties acquiesced over time in a particular method by which defendant could detect violations of Rule G.

■ There is a factual dispute as to whether the challenged detection methods were utilized by defendant prior to December 7, 1984. The Court finds that the more credible evidence indicates that the enforcement of Rule G was then done primarily through sensory surveillance by certain supervisory personnel of defendant. If an employee at work was acting abnormally, it would be reported to a carrier officer. That officer would investigate further and, if necessary, ultimately initiate the appropriate disciplinary procedures. In determining whether an employee was acting abnormally, the supervisory personnel would rely on how the employee walked, talked, smelled as well as on other sensory observations. Thus, there must have been some modicum of evidence of possible drug and/or alcohol usage before supervisory personnel took any action. The Court finds that such practice, which existed over a substantial period of time, became the only acceptable method of detection to both parties. The Court agrees with the Montana court's finding that:

Affording the term "working condition" the liberal construction to which it is entitled, the court finds the practice of detecting Rule G violations by means supervising personnel has achieved the level of an established practice, deserving an implied contractual status. Consequently, the BN (Burlington Northern) is not at liberty to change the method by which it attempts to detect Rule G violations, except in conformity with the provisions of the RLA.

*Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 620 F.Supp. 163, 170 (D.Mont.1985). Since the Court finds that it is not within the defendant's management prerogative to unilaterally change the methods of detection, it must now determine whether the changes constitute major or minor disputes.

■ The distinction between major and minor disputes was first articulated by the United States Supreme Court in *Elgin, Joliet and Eastern Railroad Co. v. Burley,*

325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed.2d 1886 (1945):

The first (a "major" dispute) relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

The second class (a "minor" dispute), however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or an omitted case. *Id.*, at 723, 65 S.Ct. at 1289.

The Eighth Circuit has simplified these definitions by finding that major disputes are concerned with the formation or amendment of a collective bargaining agreement, while minor disputes are concerned with the interpretation or application of an existing agreement. *Air Line Pilots Association International v. Northwest Airlines, Inc.*, 570 F.2d 257 (8th Cir.1978). In order to determine whether a dispute is major, one test is if the disputed action can be arguably justified by the existing agreement, the dispute is minor. *Railway Express Agency v. Brotherhood of Railway Airline and Steamship Clerks*, 459 F.2d 226, 231 (5th Cir.1972), *cert. denied*, 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1972); *Air Line Pilots Association International v. Northwest Airlines, Inc.*, 444 F.Supp. 838, 840 (D.Minn.1977), *aff'd*, 570 F.2d 257 (8th Cir.1978). Another test is if the contract is reasonably susceptible to the interpretations sought by both the carrier and the union, the dispute is minor. *Independent Federation of Flight Attendants v. Trans World Airlines*, 655 F.2d at 158–59. The tests are effectively equivalent in attempting to limit the court's jurisdiction over "contractual" disputes. *See Air Line Pilots Association International v. Northwest Airlines, Inc.*, 444 F.Supp. at 841.

The Eighth Circuit Court of Appeals has also found that whether a dispute is major or minor is often a question of degree and turns upon the facts in each case. *Missouri Pacific Joint Protective Board v. Missouri Pacific Railroad Co.*, 730 F.2d 533, 536 (8th Cir.1984). Whether a dispute is major or minor involves first a determination of factual issues, and then conclusion of law based on those findings. *Id.*, at 537.

The method by which an employer detects the violation of its safety rules, especially a violation which might result in job termination, strikes at the heart of the employer-employee relationship. *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, 620 F.Supp. 163, 171.

In *BLE I*, the Montana court found, as this Court has, that the parties agreed that the only acceptable method of detecting Rule G violations was based on sensory observation by defendant's supervisory personnel. The court also found, as this Court has, that implicit in the agreement between the parties was the fact that a modicum of evidence must exist that a particular employee is under the influence of some substance before any investigation can be conducted by the supervisor. As a result, the court concluded that the random searches through the use of sniffer dogs were not "arguably justified" by the terms of the agreement. Consequently, the dispute concerning sniffer dogs presented a "major" dispute. On the other hand, the court found that post-accident testing was not done randomly since it was only performed after an incident which gave rise to the possibility of usage of drugs and/or alcohol. Therefore, post-accident testing was "arguably justified" under the terms of the agreement. As a result, the court concluded that such testing constituted a minor dispute.

Neither party disputes that *BLE I* is controlling and that the use of sniffer dogs presents a major dispute. Defendant states that it is abiding by *BLE I* and therefore this Court finds that the issue of such detection to be moot and dismisses that claim.

 While plaintiffs dispute the applicability of *BLE II* to the case at bar (plaintiff's letter, August 29, 1985), the Court is not persuaded by plaintiffs' arguments. As in *BLE II*, the Court finds that an employee was subject to blood and urine tests only in situations in which the employee was involved in an incident that led to an operating rule violation and/or accident. Because such testing was done only when there was a modicum of evidence, the Court agrees with the Montana court that the testing challenged by the Union is "arguably justified" under the terms of the agreement now existing between the parties. Furthermore, the Court finds that the implied contractual agreement between the parties, as it relates to the enforcement of Rule G, is "reasonably susceptible" to the interpretations sought by both the carrier and the union. As a result, the Court finds the present controversy of post-incident testing to be a "minor" dispute within the meaning of the RLA.[4]

 The only type of detection before this Court that was not subject to review by the Montana court is the drug screens on urine tests conducted as part of the standard procedure in defendant's physical examination of returning furloughed employees.[5] The evidence presented in this case indicates that such screens are a re-

cent addition to the physical exams for returning furloughed employees, as are the exams themselves.[6] The evidence further shows that the institution of the physicals on the returning employees was in reaction to recent accidents. It is the Court's position that by requiring a returning furloughed employee to take a physical that includes drug screens on urine samples, the defendant is acting in a more random manner. In particular, defendant has no cause (or modicum of evidence) to know that a certain returning furloughed employee is under the influence of alcohol and drugs. The Court thus finds that such testing is not "arguably justified" by the implied agreement of both parties, nor is it a type of enforcement "reasonably susceptible" to the interpretations sought by both parties. As a result, the Court concludes there exists a major dispute.[7]

In finding that there is both a major and minor dispute before this Court, the Court still needs to determine whether a preliminary injunction should issue. *Air Line Pilots Association International v. Northwest Airlines, Inc.*, 444 F.Supp. at 840. *See also Independent Federation of Flight Attendants v. Trans World Airlines*, 655 F.2d at 159. The ability of a party to secure a preliminary injunction varies according to the classification of the dispute. If the dispute is major, an injunction maintaining the "status quo" throughout the settlement process is mandatory without consideration of equity. *United Transportation Union v. Burlington Northern Railroad, Inc.*, 458 F.2d 354, 357 (8th Cir.1972). If the dispute is minor, then

---

4. While plaintiffs argue that the compulsory nature of the post-incident testing constitutes a "major" dispute, the Court is not persuaded that it is not a penalty "arguably justified" by the implied agreement between the parties.

5. Although plaintiffs initially alleged that defendant accelerated the scheduling of physical examinations of its regular employees for the purpose of screening for drug and/or alcohol use, the evidence presented at the hearing pertained little to such allegations, and therefore the Court limits its review to only physicals given to returning furloughed employees.

6. While the Union contends that urine tests are not reliable, they did not meet any burden of proof to persuade the Court of this.

7. In concluding that there exists a major dispute, the Court notes that defendant's arguments in its motion to dismiss or stay this part of the action are unpersuasive and therefore denies such motion, except as provided above. Further, the Court notes that defendant presented several other arguments in its claim that a major dispute does not exist. The Court has considered such arguments, but is not persuaded by them.

a court should be guided by the usual principles of equity attendant upon the grant or denial of an injunction in order to maximize the primary jurisdiction of the contract grievance machinery in the Railroad Board of Adjustment. *See Order of Railway Conductors v. Pitney,* 326 U.S. 561, 567, 66 S.Ct. 322, 325, 90 L.Ed.2d 318 (1946). In reviewing a minor dispute, the Court, therefore, is governed by the standards for a preliminary injunction as set out in *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109 (8th Cir.1981).

■ With respect to the minor dispute, defendant's post-incident testing, the Court concludes that a preliminary injunction should not be issued. Under *Dataphase,* a preliminary injunction should be issued after consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Id.,* at 114. The absence of a finding of irreparable injury is alone sufficient ground for vacating a preliminary injunction. *Id.,* n. 9 at 114. After reviewing the arguments of the plaintiff, the Court is not convinced that a showing of irreparable harm has been made. The urine and blood testing is only performed after defendant has some reason to think that an employee may be under the influence of drugs and/or alcohol. The testing procedure is, in the Court's view, only a more modern method of detection than was used previously by the defendant. With respect to the third *Dataphase* factor, the Court is not convinced that the movant will succeed on the merits in light of the Montana district court's ruling in *BLE II. See Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.,* 620 F.Supp. 173 (D.Mont. 1985). Yet, as to the second *Dataphase* factor, the Court is not sure that the recent accidents are due to drug and/or alcohol usage, and therefore, the possibility of injury to the defendant, if an injunction was granted, is unclear. Further, although there is a public interest in preventing further deaths, there is also a public interest in having the parties abide by the Railway Labor Act. Nevertheless, in considering all of the *Dataphase* factors, this Court concludes that they weigh in favor of the defendant, and therefore, plaintiffs' motion for a preliminary injunction as it relates to prohibiting post-incident testing should be denied.

■ With respect to plaintiffs' motion for a preliminary injunction as it relates to the "major" dispute, drug screening of urine samples taken during physical examination of returning furloughed employees, the Court notes that there is no requirement of irreparable injury for a "status quo" injunction under the RLA. *Carbone v. Meserve,* 645 F.2d 96, 98 (1st Cir.1981).[8] Furthermore, the Court is of the position that movant may indeed succeed on the merits in this case. *See Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.,* 620 F.Supp. 163 (D.Mont.1985). While there is public interest in preventing further accidents, the Court finds that the factors to be considered in granting or denying an injunction still weigh in favor of the plaintiffs. The Court therefore grants a preliminary injunction as it relates to prohibiting drug screening of urine samples taken during physical exams of returning furloughed employees. Although the Court feels such testing is becoming more necessary, the "randomness" of this new testing is a significant change in procedure, and in light of the long-time past enforcement procedure under Rule G, the defendant is not at liberty to unilaterally change the procedure. Therefore, the Court grants plaintiffs' motion for a preliminary injunction as

---

**8.** There is legal support for the proposition that the equities usually considered in issuing an injunction do not need to be considered in issuing a "status quo" injunction, *see United Transportation Union v. Burlington Northern Railroad, Inc.,* 458 F.2d at 357, in which case a preliminary injunction should be issued here. However, this Court finds the consideration of equities to be supportive of its decision.

it relates to the screening of urine samples taken during physicals of returning furloughed employees.

■ Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the Court must consider the necessity of setting bond in any case where preliminary injunction is granted. The amount of bond and the decision of whether to require any bond rest within the sound discretion of the trial court. *Stockslager v. Carroll Electric Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976). The setting of a nominal figure as security is not advisable, since such practice is mere formality which does not discharge a court's duty under Rule 65(c). *Bass v. Richardson*, 338 F.Supp. 478, 496 (S.D.N.Y.1971). In the case at bar, if the Court were to set an amount of bond, it would be dealing in the realm of pure speculation. *Brotherhood of Locomotive Engineers v. Burlington Northern Railroad Co.*, CV–84–213–GF, slip op. at 14 (D.Mont. October 5, 1984) [Available on WESTLAW, DCTU database]. The harm which may be sustained by the defendant should the grant of preliminary injunction be ultimately found improper simply cannot be ascertained. *Id.* The potential harm is contingent on the happening of events other than those directly affected by the injunction. *Id.* As a result, this Court shall issue an injunction without the posting of a bond.

To make the record clear, the Court also has before it plaintiffs' motion to consider additional affidavits and defendant's resistance to such motion. The Court finds that the affidavits are related to the issues before this Court and should be considered and therefore grants plaintiffs' motion to consider them.

With respect to plaintiffs' Exhibit 13 (affidavit of Robert Pelava), Exhibit 46 (transcript involving a Rule G violation), and Exhibit 50 (affidavit of James Schaefer), the Court reserved ruling on said exhibits during the hearing. Since the hearing, the Court has received a letter from defendant's counsel stating that it no longer objects to plaintiffs' Exhibits 13 and 50 given

that the Court considers the transcript of cross-examination taken of Robert Pelava as well as the deposition of Dr. James Schaefer. Therefore, plaintiffs' Exhibits 13 and 50 are admitted. With respect to plaintiffs' Exhibit 46, this Court sustains defendant's objection and it will not be admitted into evidence.

IT IS THEREFORE ORDERED that plaintiffs' motion for a preliminary injunction be granted in part to the extent that defendant be enjoined from performing drug screen on urine tests taken during physicals of returning furloughed employees. No bond will be set. Defendants are further ordered to comply with § 6 of the Railway Labor Act, 45 U.S.C. § 156.

IT IS FURTHER ORDERED that defendant's motion to dismiss or stay this action be granted in part to the extent that plaintiffs' claims concerning "sniffer" dogs be dismissed.

IT IS FURTHER ORDERED that plaintiffs' Exhibits 13 and 50 be admitted into evidence and plaintiffs' Exhibit 46 be denied.

IT IS FURTHER ORDERED that plaintiffs' motion to consider additional affidavits be granted and the affidavits were considered in the rulings set out herein.

IT IS FURTHER ORDERED that the parties to this action shall complete any required additional discovery on or before December 1, 1985 and that a hearing on a permanent injunction, if needed, shall be set soon thereafter.