BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, LODGE 16, et al.; Brotherhood of Maintenance of Way Employees, Grand Lodge, et al., Intervenors, Appellants,

v.

BURLINGTON NORTHERN RAILROAD COMPANY, Appellee.

Nos. 85–2360, 85–2412.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1986.

Decided Oct. 1, 1986.

Harry W. Zanville, Cedar Falls, Iowa, for appellants.

Richard J. Schreiber, Fort Worth, Tex., for appellee.

Before ARNOLD, FAGG and WOLL-MAN, Circuit Judges.

PER CURIAM.

■ This is a suit in equity for an injunction preventing the defendant, Burlington Northern Railroad Co., from putting into effect unilaterally certain methods for detecting drug use among its employees. In general, if a proposed practice by a rail carrier is a clear departure from the collective-bargaining agreement, a dispute over the practice is treated as a "major dispute" under the Railway Labor Act, and the carrier may not proceed without first negotiating with the employees' representative. But if the proposed practice is arguably justified by the collective-bargaining agreement (including settled past practices of the parties under the agreement), then a dispute is called "minor," and the carrier may proceed unilaterally, subject to an arbitration process before the National Railroad Adjustment Board.

This appeal involves two disputed proposed practices. First, the railroad wants to administer chemical drug testing to all employees who appear to be involved in any accident or other incident which seemingly stems from human error. Second, the railroad wants to administer similar tests to all employees who return to work after a furlough or similar absence. The District Court, 642 F.Supp. 41, held that the dispute over the first practice (post-incident testing) was minor. It therefore denied the injunction sought against the railroad's proposed initiation of this practice. But with respect to the second challenged practice (post-furlough testing), the Court held the dispute major and therefore granted the injunction.

Both sides appeal. The union seeks reversal of the denial of the injunction against post-incident testing. The railroad seeks reversal of the grant of the injunction against post-furlough testing.

As to the first issue, we affirm. As to the second, we reverse. The Court's reasons for these holdings are expressed in two opinions. An opinion by Judge Arnold, in which all Members of the Court join, explains our holding that the railroad may proceed with post-incident testing. An opinion by Judge Fagg, in which Judge Wollman joins, explains our holding that the railroad may proceed with post-furlough testing. Judge Arnold dissents from this latter holding.

The judgment of the District Court, insofar as it denied an injunction with respect to post-incident testing, is affirmed. Insofar as it granted an injunction with respect to post-furlough testing, the judgment is reversed, and the injunction is vacated and set aside.

It is so ordered.

ARNOLD, Circuit Judge, for a unanimous Court, concurring in part.

This case involves a dispute between the Burlington Northern Railroad Co. (BN) and the Brotherhood of Maintenance of Way Employees (employees or union) over BN's efforts to deal with drug and alcohol abuse on the job. In response to several serious accidents on the railroad, which were found to have been related to abuse of drugs on the job, BN began a program of mandatory drug testing of employees. Two aspects of this program are before us now: One is "post-incident testing," in which the company requires employees who are involved in accidents or other incidents in which human error could have been a factor to submit to urinalysis in order to determine whether alcohol or certain drugs are in their system. The other testing program involves addition of a drug screen to the standard urinalysis which is part of a re-

quired medical examination given to employees periodically and when they return from furlough. The employees take the position that both testing programs amount to major changes in working conditions and therefore should not be implemented without prior negotiation. The District Court[1] agreed with the union as to the drug screen in required medical examinations, and enjoined its use. However, the Court held that the company's program of post-incident testing was at most a minor change in working conditions and therefore denied the injunction sought by the employees against this practice. Both parties have appealed. As already noted, the Court affirms as to post-incident testing and reverses as to the required medical examination on return to work. This opinion gives our reasons for affirming as to post-incident testing.

## I.

For a number of years, BN has had among its operating rules a rule (which is uniform throughout the railroad industry) prohibiting employees from using, possessing, or being under the influence of alcohol or other drugs while at work or subject to duty. This rule, known as Rule G, reads as follows:

> The use of alcoholic beverages, intoxicants, and narcotics, marijuana, or other controlled substances by employees subject to duty, or their possession or use while on duty or on Company property, is prohibited. Employees must not report for duty under the influence of any alcoholic beverage, intoxicant, narcotic, marijuana, or other controlled substance, or medication, including those prescribed by a Doctor, that may in any way adversely affect their alertness, coordination, reaction, response or safety.

Designated Record (D.R.) at 217b. The prohibitions of Rule G are also incorporated in BN's safety rules. D.R. at 217a. Any on-duty employee found in violation of these rules is subject to suspension or discharge.

The District Court found that the accepted method of enforcing Rule G in the past had depended primarily on the watchfulness and sensory observation of supervisors. If a supervisor detected abnormal behavior in an employee which led the supervisor to suspect that the employee was working under the influence of alcohol or drugs, then the supervisor would report his suspicion to an officer of the railroad, who would conduct further investigation. In determining that an employee appeared to be under the influence, the supervisor would rely on how the employee walked, talked, or smelled as well as on other physical manifestations of impairment. In recent years the company began to use breathalyzer, blood-alcohol, and urinalysis testing in connection with its enforcement of Rule G. Prior to December 1984, however, these tests were used only as a means for the employee to clear himself of an accusation that he was working while impaired. The BN policy in effect before that date stated in part:

> Intoxilator, breathalyzer, blood alcohol tests, or urinalysis may not be administered without probable cause. Probable cause exist [sic] only when there is an outward manifestation of intoxication. Examples of such outward manifestations include the odor of alcohol on the breath, slurred or thick speech, apparent loss of coordination, unsteady gait. If such probable cause exists, the employee should be offered the opportunity to submit to intoxilator, breathalyzer, blood testing, and/or urinalysis. Again, before the administration of any such test, the employee must sign a Consent Form. If the employee refuses to submit to such testing after a determination that probable cause exists, he or she should be taken out of service and charged with violation of Rule G.

D.R. at 144–45.

Beginning around December of 1984, BN modified its Rule G enforcement methods.

---

**1.** The Hon. Donald E. O'Brien, Chief Judge, United States District Court for the Northern        District of Iowa.

It redefined the events which would trigger the use of chemical tests; it also began to use these tests, particularly urinalysis, as a primary means for establishing the possibility of drug abuse in employees, whereas in the past the tests had been available as a means for employees to exonerate themselves of a charge of alcohol or drug abuse on the job. The revised policy allowed supervisors to screen employees for drug abuse not only when the employee showed physical manifestations of impairment, but also when the employee was involved in an accident, an on-the-job injury, a rule violation, or an unsafe act. D.R. at 201. When an accident or other incident involved more than one person and responsibility could not be attributed to a particular individual, the entire crew was to be subjected to urinalysis (whether or not any member of the crew showed signs of intoxication or impairment). D.R. at 68. BN contracted with an outside laboratory for the performance of these urinalyses. Results of the tests were to be returned to the BN medical department. However, when the supervisor requesting the test had immediate need of the results, he was authorized to use local medical facilities which would report the results directly to him. D.R. at 202-03.

Dr. Michael A. Evans, the director of the laboratory hired by BN for urinalysis testing of employees, testified by affidavit and submitted exhibits explaining the purpose, accuracy, and techniques used in drug testing of urine. The primary method used is called the Enzyme Multiplied Immunoassay Technique (EMIT). This test is designed to detect the presence of certain drugs or their metabolites (breakdown products) in a urine sample. The test does not purport to measure intoxication or impairment. D.R. at 193. The EMIT test is highly accurate, producing no more than 5% false positives. The laboratory confirms positive results through use of a gas chromatography/mass spectrometry test (GC/MS), which is considered to be the most accurate available. Although Dr. Evans testified that the EMIT test was calibrated to screen for marijuana at a level above the lowest amount which will produce an effect in a human being (see D.R. at 173), he submitted as an exhibit material describing the EMIT process which indicated that the highly sensitive EMIT test could detect traces of the drug for as long as three weeks after its use and could on occasion produce a positive result in a "passive inhaler" (a person who had been exposed to marijuana smoke through another person smoking in the vicinity). See D.R. at 193. The District Court made no specific findings favoring either Dr. Evans's affidavit or his possibly contradictory exhibit.

These changes in post-incident testing were unilaterally imposed by BN in November of 1984 over the vigorous objections of the employees. They assert that there was for a number of years a settled, established practice, understood and accepted by both BN and the union, that BN would be entitled to investigate for possible drug or alcohol abuse on the job only when an employee appeared, through observation, to be intoxicated or otherwise impaired. This appearance of impairment alone was sufficient cause to remove the employee from service pending further investigation. The employee could then choose to submit to breath, blood, or urine testing to prove that he was not under the influence. The employees argue that by broadening the definition of sufficient cause to include rule violations and on-the-job injuries, and by including within the suspect group all crew members regardless of whether they appear to be impaired, the railroad has lowered the threshold of suspicion far below the level contemplated by the parties' established past practice. They also object to the mandatory use of urinalysis in the post-incident investigation program. This objection seems to be of two parts: (1) formerly, objective testing was at the option of the individual employee if he wished to exonerate himself of a charge of substance abuse; refusal to submit to a test could result in citation for violation of Rule G because the employee had already manifested signs of impairment. Under the present policy, the test is mandatory; refusal to submit to the

test is deemed an automatic violation of Rule G regardless of any actual evidence of impairment. (2) The employees strenuously insist that the urinalysis test by itself does not measure impairment; instead, it detects the mere presence of drugs or their end-products in the system, perhaps long after the impairment has worn off. They argue that by using urinalysis as a primary means of detecting possible Rule G violations (rather than as a test to confirm or refute apparent intoxication) the railroad has unilaterally changed the meaning of Rule G itself. Instead of prohibiting impaired performance on the job, it now punishes past exposure to drugs even if there is no effect on work performance. The employees see these changes as being contractual in scope and therefore seek to have BN's action enjoined while negotiation runs its course.

BN agrees that there is an established course of conduct between the union and the railroad. It sees the past practice as having given BN the power to use reasonable means to investigate possible drug or alcohol abuse on the job whenever there appeared some evidence that an employee was violating Rule G. In the past, most of the violations involved drinking on the job or reporting drunk for work. Alcoholic intoxication manifests itself in physically apparent ways. The drunken employee may exhibit the odor of alcohol on his breath, may have slurred speech or a stumbling gait. When a supervisor notices an employee acting in a way which suggests intoxication, he has the power to remove the employee from service. Of course, the employee always has the opportunity to prove that he is not under the influence. This routine has been reasonably satisfactory in the past when the chief source of Rule G violations was alcohol. But the use or abuse of marijuana and other illegal drugs frequently does not produce an externally obvious state of impairment. The intoxicating effect of these substances is said to be primarily mental or emotional; a user's judgment or clear-headedness may be impaired without any obvious physical sign of intoxication. It is the insidious nature of these substances that too often the user's faculties are impaired and the damage done through a serious error on his part before he realizes that he is impaired and without any outward sign of his impairment that could lead a supervisor or other person to intervene. BN argues that in order to deal with the threat of serious incidents caused by drug abuse it is entitled to use all reasonable means which are available so long as it first has some cause to believe that the employee has abused drugs. The occurrence of a human-error accident or safety violation or on-the-job injury in which a failure of judgment has been a factor is, it says, sufficient cause to suspect that drug abuse may have been the cause and to initiate further investigation. BN says that the principle is the same as under the former policy: that is, upon some cause for suspicion, the company is entitled to take the employee out of service and use reasonable means to investigate. Believing that this is at most a minor change in working conditions, BN unilaterally imposed the modified policy and submitted the dispute to the National Railroad Adjustment Board, which is the proper method for resolving minor disputes. Having done so, BN asserts that it has fully complied with the Railway Labor Act and that this Court is without jurisdiction to interfere.

## II.

We deal first with the dispute as to post-incident testing. On this part of the case, the District Court essentially agreed with BN's view and accordingly denied the injunction sought by the employees. Since this case comes to us in the context of an appeal from the denial of a preliminary injunction, our power to review is limited to whether the trial court clearly erred in its characterization of the facts, made a mistake of law, or abused its discretion in considering the equities.

Relations between the union and the railroad company are governed by the Railway

Labor Act, 45 U.S.C. §§ 151–188.[2] In recognition of the critical national importance of uninterrupted commerce by rail, the Act is designed to provide for the prompt and orderly settlement of both fundamental contractual disputes and of grievances between union and management, so as to avoid the disruption of commerce which would be occasioned by strikes or other means of self-help by either side. 45 U.S.C. § 151a. The Act imposes on both employees and the railroad the duty to negotiate whenever a dispute arises. 45 U.S.C. § 152 First, Second. However, beyond the initial stages of negotiation, the Act distinguishes between "major" and "minor" disputes.[3]

For the major type of dispute, i.e., one which seeks to change the rates of pay, rules, or working conditions in a way not contemplated by the collective-bargaining agreement, the Act requires the parties to seek settlement through the noncoercive means of negotiation, mediation, voluntary arbitration, and conciliation before resorting to self-help. Major changes in the relationship between employees and the railroad may not be implemented unilaterally. See 45 U.S.C. § 156. In a minor dispute, on the other hand, minor changes in working conditions may be implemented while settlement is sought through arbitration before the National Railroad Adjustment Board. See 45 U.S.C. § 153.

■ The question whether a dispute is major or minor determines the degree to which a federal court may become involved in the dispute. If the dispute is major, the courts have broad powers to enjoin unilateral action by either side in order to preserve the status quo while settlement procedures go forward. Such an injunction may issue without regard to the usual balancing of the equities. *United Transportation Union v. Burlington Northern, Inc.*, 458 F.2d 354, 357 (8th Cir.1972). But if the dispute is only minor, the court's power is more limited since the NRAB has exclusive jurisdiction over such minor disputes. The traditional power to enjoin under equitable principles remains, but in the usual case it is inappropriate to exercise this power since irreparable loss and inadequacy of the legal remedy cannot plainly be shown until the NRAB has had an opportunity to act. See *Order of Railway Conductors v. Pitney*, 326 U.S. 561, 567, 66 S.Ct. 322, 325, 90 L.Ed. 318 (1946). In rare cases, however, an injunction may be necessary even in a minor dispute in order to

---

**2.** BN argues in the alternative that the Railway Labor Act does not apply at all, that it has a "management prerogative" to put into effect unilaterally the proposed changes. We reject this position.

**3.** The terms "major" and "minor" are not found or defined in the Act, which speaks of "change[s] in agreements affecting rates of pay, rules, or working conditions," 45 U.S.C. § 156, as one kind of dispute, and of "disputes ... growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," 45 U.S.C. § 153(i), as another. The accepted distinction between major and minor disputes is found in *Elgin, Joliet & Eastern R. Co. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). There, the Court said that major disputes are those which arise

over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to

assertion of rights claimed to have vested in the past....
\* \* \* \* \* \*
... [They are] the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid.

*Id.* at 723–24, 65 S.Ct. at 1290. A minor dispute, on the other hand,

contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.... [T]he claim is to rights accrued, not merely to have new ones created for the future.
\* \* \* \* \* \*
... [Minor disputes] seldom produce strikes....

*Id.* at 723–24, 65 S.Ct. at 1289–90 (footnote omitted).

preserve the jurisdiction of the NRAB, i.e., to keep the dispute from growing into a major one while the settlement process is under way. *Locomotive Engineers v. Missouri-Kansas-Texas Railroad,* 363 U.S. 528, 533–34, 80 S.Ct. 1326, 1329–30, 4 L.Ed.2d 1379 (1960). The court must take care, however, that its injunction does not serve to adjudicate the merits of the case, which remain within the jurisdiction of the NRAB until that tribunal has acted. *Ibid.*

■ Whether a dispute is major or minor depends on whether it is arguably comprehended within the agreement of the parties. The court must first determine what that agreement is. Since, as a practical matter, it is impossible for the written collective-bargaining agreement to describe every possible permutation of working conditions which might arise, it is not unusual for the parties to a labor agreement to develop working relationships, customs, and practices which are understood to be the norm, but which are nowhere reduced to a formal contract term. When longstanding practice ripens into an established and recognized custom between the parties, it ought to be protected against sudden and unilateral change as though it were a part of the collective-bargaining agreement itself. Such practices have been described as the "actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose." *Detroit & Toledo Shore Line Railroad v. United Transportation Union,* 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969).

This Court has said that a dispute is minor if the agreement is "reasonably susceptible" of the interpretations sought by both the employer and the employees. *Independent Federation of Flight Attendants v. Trans World Airlines,* 655 F.2d 155, 158 (8th Cir.1981). Other courts have said that a dispute is minor if the employer's action can be arguably justified under the terms of the existing agreement, see, e.g., *REA Express, Inc. v. Brotherhood of Railway, Airline, and Steamship Clerks,* 459 F.2d 226, 231 (5th Cir.), *cert. denied,* 409 U.S. 892, 93 S.Ct. 115, 34 L.Ed.2d 149 (1972), or that the dispute is minor unless the employer's argument that its actions are within the contract is "obviously insubstantial," see *Airlines Stewards & Stewardesses Association v. Caribbean Atlantic Airlines,* 412 F.2d 289, 291 (1st Cir. 1969). These locutions are essentially the same in their result. They illustrate the relatively light burden which the railroad must bear in showing that its actions are at most minor changes and thus within the status quo.

### III.

■ Applying these principles to the facts of the present case, we note that nothing in the collective-bargaining agreement refers in any way to Rule G or to enforcement or investigation methods. Nevertheless, we agree with the District Court that the union has long shared in BN's concern over the abuse of alcohol and drugs by employees on the job. Accordingly, the parties have acquiesced in certain detection and investigation methods over the years, and these practices may fairly be considered to have become the status quo. That being so, the railroad may not depart from these established practices in such a substantial way as to abrogate the implied contractual term which they represent. But so long as the railroad keeps within the bounds of this understanding, the employees are not entitled to an injunction against minor changes in method which are reasonably within the agreement.

The District Court found as fact that in the past BN had relied on the sensory observations of supervisors as its means of detecting Rule G violations, and that "such practice, which existed over a substantial period of time, became the only acceptable method of detection to both parties." *Brotherhood of Maintenance of Way Employees v. Burlington Northern Railroad,* No. 642 F.Supp. 41, *reprinted in* Appellant's addendum at 7 (N.D.Ia.1985). This accepted method of detection applied only to alcohol-abuse problems, which have, until recently, been the major focus of con-

cern of both parties. Underlying this detection method was the principle that BN could not or would not remove an employee from the job or investigate for possible substance abuse without some reason for suspecting that employee. In other words, there were no at-large screening of employees or random searches. The District Court described the threshold level of suspicion as a "modicum of evidence" without elaborating on what that meant. *Ibid.* We note that BN's legal counsel, in describing the established policy, stated that an employee could be removed from service pending further investigation upon a showing of "probable cause." D.R. at 144–45. We doubt that this term was intended in its usual criminal-law sense; there was evidence from which the District Court could reasonably have concluded that some lower quantum of suspicion was sufficient under the parties' established practice. *Cf. Brotherhood of Locomotive Engineers v. Burlington Northern Railroad,* 620 F.Supp. 163, 171 & n. 8 (D.Mont.1985), *appeal pending,* No. 85–4138 (9th Cir. argued July 8, 1986). (In a similar case challenging BN's drug-enforcement methods, the District Court used the term "modicum of evidence" and declined to speculate whether that term was more akin to "probable cause" or to "reasonable suspicion" as known in the criminal law.) Nevertheless, whatever the actual quantum of evidence the parties' past practice allowed, we find the record to be clear that suspicion must be particularized in one or more employees and must be based on something more solid than speculation or rumor before the railroad may act. The union's acquiescence in BN's past methods of enforcement was hardly intended or understood by either party to authorize a dragnet. See *Brotherhood of Locomotive Engineers, supra,* 620 F.Supp. at 171–72, invalidating a random-search policy.

The union does not deny that the railroad has the right to ensure the safety of its operations by removing from service any employee who is unable to perform his duties safely. The past practice of the parties shows that there has been little objection to the railroad's exercising this prerogative whenever common-sense observation of a particular employee suggested that the employee was impaired. Indeed, in the past no further testing or detection was necessary once a supervisor had determined through observation that all was not well with the employee. What the railroad has done now is to add a more refined step, the urine test, to confirm the observation of the supervisor. Since the test can be required only upon some showing that the employee may be impaired, the ground rules between the union and the railroad have not changed significantly; suspicion of impairment is still required; instead of simply taking the suspected employee out of service, the railroad now seeks to confirm its suspicion before taking that step. We find no error in the conclusion of the District Court that this amounts, at the most, to only a minor change in working conditions. Accordingly, the Court properly declined to issue the status-quo injunction sought by the employees.

The policy that BN is thus left free to follow includes, in some circumstances, testing all the members of a crew. This will occur, however, only after an "incident" happens, and only when individual responsibility is not clear. BN's own statement of its policy emphasizes this point: "BN intends to continue implementing this policy in a common sense manner. For example, where individual responsibility is clear and other crew members are not involved in the action causing the incident, a urinalysis test should only be required of the individual crew member having such exclusive responsibility for the action triggering the incident." D.R. at 69. We do not understand BN's policy to permit testing on a less discriminating basis, and we express no view on whether a broader testing policy would be such a serious departure from past practice as to give rise to a major dispute.

To the extent that the District Court's order left BN free to implement its new post-incident testing policy, it is affirmed.

FAGG, Circuit Judge, joined by WOLL-MAN, Circuit Judge, concurring.

To ensure the safety of its operations, BN seeks to eradicate on-the-job drug abuse. In response to the revelation that "several serious accidents on the railroad [were] related to abuse of drugs on the job," *ante* at 1017, BN has understandably expanded the scope of its post-incident testing as well as its periodic and return-to-work medical examination.

We agree that BN's post-incident testing program is a minor dispute within the context of these parties' collective bargaining agreement. It is also our view that addition of a drug screen to the routine urinalysis phase of an established medical examination program is a minor dispute.

■ BN's past practice of requiring employees to submit to periodic and comprehensive medical examinations in order to ensure all employees are fit for duty is not challenged. Indeed, the union does not deny BN "has the right to ensure the safety of its operations by removing from service any employee who is unable to perform his duties safely." *Ante* at 1023. Basically, all that is involved in the parties' dispute is the extent to which the urinalysis component of these examinations may be refined in order to predict safe employee performance.

It is beyond dispute the drug screen is a new technique; the underlying purpose of the medical examinations, however, remains the same—to ensure all BN employees are fit for duty. The drug screen is nothing more than a method designed to detect the presence of a newly emerging threat to that fitness.

The use of a more comprehensive urine test has not significantly changed the ground rules between BN and the union. It should come as no surprise to the parties that the components of a work fitness medical examination will change with the times. Because BN and the union are involved in a dispute over the scope of BN's actions designed "to ensure that all employees are fit for duty"—actions which are arguably justified—this dispute should be submitted to the National Railroad Adjustment Board.

Accordingly, to the extent that the order of the District Court enjoined BN's proposed new medical-examination policy, it is reversed, and BN is free to proceed with this policy, as well as with post-incident testing.

ARNOLD, Circuit Judge, dissenting in part.

The second major issue arises out of BN's addition of a "drug screen" to the medical urinalysis which is a part of scheduled examinations given to employees on a periodic basis and when they return from extended absence or furlough. In the past, the railroad has required of employees a periodic and comprehensive medical examination in order to ensure that all employees are fit for duty. Recently, medical examinations have been extended to returning seasonal employees, those who work for part of the year and then are furloughed for three months or more. This examination has always included laboratory examination of urine and blood samples. The change of which the employees complain is the railroad's addition of the drug screen to this urinalysis. This new examination is universal and indiscriminate, in the sense that it is imposed without regard to any degree of suspicion that the employee is working while impaired. In this way it differs significantly from post-incident testing. There is no precedent in the relationship between employees and railroad for this sort of probing into the private behavior of employees, and the District Court did not clearly err in finding that in instituting such a regimen of testing without first requiring some showing of particularized suspicion the railroad was effecting a major change in working conditions.

The railroad argues that this program of indiscriminate testing is a necessary element of determining medical fitness of employees. It asserts that the results of positive tests are kept strictly confidential and that employees who test positive are re-

ferred for counseling in the company's Employee Assistance Program but are not subject to removal from employment or other discipline. But as a practical matter, the fact that an employee has been sent to the Employee Assistance Program is no secret. The Employee Assistance Program is informed by the Medical Department of the positive drug-screen result; the employee's supervisor is aware that the employee is being counseled; failure to cooperate with the program results in medical disqualification regardless of whether the employee is "drug-dependent" or not. D.R. at 25. The railroad's program of universal drug-testing could result in the dismissal of an employee without any prior suspicion of his use of drugs. This is a major departure from the established practice between employees and railroad. Such a change cannot go forward without appropriate negotiations between the parties. The District Court acted properly under the Railway Labor Act by issuing a status-quo injunction prohibiting the railroad from proceeding with this portion of the program.

The railroad and the employees may ultimately come to an understanding that Burlington Northern's proposed method of medical intervention in employee drug-abuse problems is the best way of approaching this problem. However, that result must be reached through arm's-length bargaining between the parties, not through unilateral compulsion on the part of the railroad. Thus, I think the injunction issued by the District Court should remain in force pending negotiation of the major change proposed by the railroad.

From so much of this Court's action as reverses the order of the District Court, I respectfully dissent.